COMMONWEALTH vs. GREGORY ROBINSON.

Suffolk. September 9, 1980. — January 6, 1981.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide. Jury and Jurors. Duress. Due Process of Law*, Duress. *Practice, Criminal*, Challenge of jurors, Instructions to jury. *Evidence*, Presumptions and burden of proof.

The record of a trial of a black defendant showing that the prosecutor peremptorily challenged two of three black prospective jurors and one Puerto Rican, that the final jury were all white, and that the victim of the crime was Oriental was not adequate to support the defendant's claim that he was denied his rights under art. 12 of the Declaration of Rights of the Massachusetts Constitution. [194-196]

At the trial of a defendant charged with first degree murder, the judge's failure to read the jury the last sentence of the murder statute, G. L. c. 265, § 1, in his instructions did not amount to reversible error where counsel failed to except to the omission and where nothing in the facts looked to murder in the second degree. [196-197]

At the trial of a defendant charged with first degree murder, there was sufficient evidence to warrant an instruction on premeditation. [197]

At a criminal trial, an instruction to the jury that being satisfied beyond a reasonable doubt means having a "full and abiding conviction of the guilt of the defendant" after a "careful and candid and impartial consideration of all the evidence" was adequate. [197-198]

There was no merit to a defendant's contention that a judge's charge to the jury failed to place the general burden of proof clearly on the Commonwealth. [198-199]

Discussion of the meaning of duress in respect to crimes of a serious nature. [199-200]

Discussion of the burden of proof with respect to duress. [200-206]

At a murder trial in which the defendant made a claim of duress, the judge's instructions with respect to the burden of proof regarding duress were adequate even though there was no explicit instruction that the Commonwealth bore the burden of negating duress beyond a reasonable doubt. [206-209]

MOTION for a new trial filed in the Superior Court on January 17, 1978.

The proceeding was heard by *McGuire*, J.

*Willie J. Davis* for the defendant.

*John A. Kiernan*, Assistant District Attorney (*Sharon D. Meyers*, Legal Assistant to the District Attorney, with him) for the Commonwealth.

KAPLAN, J. In April, 1976, a Suffolk County jury found the defendant Gregory Robinson guilty of murder in the first degree, of armed robbery, and of two counts of assault by means of a dangerous weapon.[1] Shortly after sentence, counsel filed a formal motion for a new trial and a notice of appeal. The trial judge denied the motion in July, 1977, and dismissed the appeal in December, 1977, for failure to file an assignment of errors (see G. L. c. 278, § 33F, repealed by St. 1979, c. 346, § 3). The defendant, however, acting pro se, in January, 1978, filed a second motion for a new trial. Appointed counsel improved the motion by amendment. It was denied by the trial judge in November, 1979, with memorandum dated in April, 1980. This denial is the subject of the present appeal.

The motion contended that the prosecutor's use of peremptory challenges in jury selection was racially biased, and also attacked several parts of the judge's charge to the jury: his instructions on the jury's role in determining the degree of murder, on premeditated murder, on reasonable doubt, and on the burden of proof (in general, and as to "duress"). After describing the facts, we consider these points, and conclude by affirming the convictions.

1. *Narrative.* We state briefly the core facts. The defendant and one Ronald Ellis[2] approached the Peking House

---

[1] Concurrent with a life sentence to Massachusetts Correctional Institution at Walpole for murder, the defendant received sentences of ten to fifteen years for the armed robbery, and two three- to five-year terms for the armed assaults.

[2] The Commonwealth moved for the separate trial of Ellis in June, 1976. A jury was empanelled, but before any testimony was taken, Ellis pleaded guilty to murder in the second degree, unlawful possession of a

restaurant in the Roxbury section of Boston about 12:45 A.M., December 16, 1975, and asked Shung Li, who was locking the front door, for an order of rice. Shung Li allowed the men to enter and walked with them to the rear kitchen area of the restaurant where Yip Ming, Yung Kam Tai, and Sheung Lee were cleaning up. Ellis drew a sawed-off shotgun from under his jacket and ordered the four employees to get down on the floor. He told the defendant to search for money. Although Sheung Lee quickly rendered Ellis's order to the employees into Chinese, Shung Li, who had little English, may have remained standing. Ellis fired his shotgun, wounding Shung Li in the chest. Ellis and the defendant left the restaurant with some $300 the defendant had found in a kitchen cabinet drawer. Shung Li died of the wound next day.

We turn to the defendant's testimony about the events of the evening in which he sought to picture himself as acting under supervening pressure from Ellis. The defendant said he met Ellis for the first time at a "shooting gallery" in Roxbury between 8 and 9 P.M., December 15. Ellis had taken cocaine or heroin; the defendant took heroin. While waiting for the shots to take effect, Ellis spoke of an encounter with an acquaintance at a bar earlier that evening which had ended with the man pulling a pistol on him. He solicited the defendant's help in fetching his own gun and going back to the bar to confront the man. The defendant undertook to drive Ellis to Ellis's house in Dorchester and they drove off in the defendant's automobile, a green Buick borrowed, as it happened, from the defendant's girl friend Janice Bacon.

Arriving at Ellis's house, the defendant waited in the car while Ellis went in and then emerged with a green Army duffel bag containing, as the defendant assumed, a gun (in fact a sawed-off shotgun). The defendant drove to the indicated bar near the Dudley subway station in the Roxbury

shotgun, armed robbery, and two counts of assault with a deadly weapon.

section of Boston and again waited as Ellis entered and returned, saying that the man was not there.

The defendant and Ellis drove about for two hours talking and drinking wine. Ellis spoke of "taking off some joint" but the defendant, so he testified, disclaimed any interest in such a venture. Finally they returned to Roxbury. Coming out of a bar where they had used the rest room, Ellis proposed robbing a Merit gas station across the street. The defendant declined to take part, and drove off alone. But as the defendant waited a red light at a near corner, Ellis reentered the car taking the front passenger seat. At that point Ellis's shotgun discharged into the adjacent door. The blast, said the defendant, "panicked" him. Ellis said it was an accident, but the defendant testified he "couldn't understand" how that could be.

The defendant asked Ellis where he wanted to be left off and Ellis directed him, but en route Ellis ordered the defendant to stop by the Peking House restaurant so they could rob it. The defendant said he didn't want to do it and pointed out some hazards in the robbery as a means of discouraging Ellis. But ultimately he did as Ellis wished because he was "afraid" of Ellis and his shotgun and "couldn't see anything else to do."

As to his conduct while in the restaurant, the defendant testified that he alternated between acting as lookout from a position in the doorway between the kitchen and the front serving area, and responding to Ellis's command to search for money by rummaging in a kitchen cabinet. At one point he blocked Ellis from pushing one of the employees into the serving area; he explained that he feared the police would see the robbery in progress and shoot him as they entered. He said he tried to persuade Ellis to leave the restaurant, but Ellis merely directed him to look for more money. Regarding the shooting of Shung Li, the defendant testified he was on lookout when he heard the shot. He ran to the store front to see if anything stirred, and returned to the kitchen area. He did not notice that Shung Li had been wounded. On Ellis's order he resumed looking for money in the kitchen

cabinet. Some minutes later, when Sheung Lee reached across him for the phone to call a doctor, he turned and saw Shung Li bleeding on the floor. He and Ellis then left.

There was possible confirmation of part of the defendant's story in the testimony of Janice Bacon, called by the defense. She said she found a hole in the front passenger door of her Buick automobile that was not there, she thought, when she lent the car to the defendant on December 15. But she said she first observed the hole sometime in January. James E. Higgins, a Boston police ballistician, called by the prosecution, testified that the hole in the door was consistent with a blast from a shotgun, but that it could also have been made by ramming an iron rod through the door.

Without getting into the detail of the Commonwealth's case, we say a word about its evidence bearing on the claim of duress. Ellis was not called. The defendant's taped statement, given to Detective Peter O'Malley on January 8, 1976, was played to the jury. Here the defendant indicates that the robbery was Ellis's idea, but there is not more than a hint of duress. On the tape the defendant says that he and Ellis were broke that night and were driving about looking for a "place to hit." The tape has nothing about a shotgun blast in the car. (In testimony the defendant said he was "confused" the day he talked to Detective O'Malley, and O'Malley had cut off his statement at various points. Neither claim is evident from hearing the tape. It appears to run continuously during the defendant's statement.) On the tape the defendant says that after stopping the car two doors down from the restaurant in front of a smoke shop, he moved the car some distance to avoid bright illumination of the license plate by the shop's neon lights. (In testimony the defendant explained the move as intended to allow the customers to leave the restaurant and the door to be closed so that the robbery would be thwarted.)

Donna Horner, a prosecution witness, said the defendant told her that he and another fellow had robbed a Chinese restaurant; that as they were leaving the place he told the

other guy to "[s]hoot the motherf-----" and to his surprise the fellow did shoot. He also told her that he carried a pistol during the episode, and the other fellow a shotgun. The defendant's avowal to Horner came on January 2, 1976; she said they were in bed together, the defendant (but not Horner) having taken heroin.[3] (It may be noted that the restaurant employees did not observe a weapon in the defendant's hands.)

After the robbery, the defendant accompanied Ellis to Ellis's girl friend's place. As against testimony by the defendant suggesting that he continued in fear of Ellis, the girl friend, Diana Dozier, called by the Commonwealth in rebuttal, described the two as counting out and dividing the money and saying they could have gotten more, and mentioning an "accidental" shotgun burst in the car in what she took to be a friendly or joking manner. She said the defendant came by two days later asking for Ellis. He asked for Ellis again when she ran into·him at Dudley station three days after the robbery.

With respect to chances of escape, the defendant said on the tape that he was alone in the car when he moved it down from the smoke shop. (He put Ellis still in the car in his testimony.) In testimony the defendant admitted that Ellis stopped to put on the defendant's coat before the two entered the restaurant (the shotgun could be concealed under the coat), but he claimed nevertheless that the shotgun never left Ellis's possession. He knew a bar across the street from the parked car which he "imagine[d]" would be open late, but he did not try to run to it. Just after Shung Li was shot he was alone at the store front, but did not try to leave because, he said, he was not sure the door would open.

2. *Peremptory challenges.* The defendant is black. He argues that the prosecution denied him rights under art. 12

---

[3]Horner met the defendant at a methadone clinic in late December, 1975. The defendant allegedly assaulted her on January 3 and she complained of it to Detective O'Malley at District 2 on January 7. It was in the course of O'Malley's arresting the defendant on January 8 for the assault that the defendant spoke of the robbery, the story being then reduced to tape.

of the Declaration of Rights of the Massachusetts Constitution, as laid out in our opinion in *Commonwealth* v. *Soares*, 377 Mass. 461, 488, cert. denied, 444 U.S. 881 (1979), by using peremptory challenges to exclude "all persons of color" from the jury that tried him. The jury were all white. Objection was taken the day after empanelment and made the basis of a motion to empanel a new jury, which the judge denied. As to the circumstances of jury selection, we have only the statement of the defense attorney as he recorded his objection: the prospective jurors examined included three blacks and one Puerto Rican; one of the blacks was excluded for cause, the other three were challenged peremptorily by the prosecutor.

*Soares* applies retroactively to defendants in cases "pending on direct appeal [at the time of decision, March 8, 1979] where the record is adequate to raise the issue." *Id.* at 493 n.38. But the appeal of the present defendant had been dismissed a year earlier, on December 1, 1977. In *Reddick* v. *Commonwealth*, 381 Mass. 398, 399 (1980), we reasserted the limit on retroactive application at least where, as here, racial tension appeared not to have been a factor at trial. The present record would be a poor candidate to command a reversal of the convictions under *Soares* in any event.[4] According to *Soares* a presumption continues that peremptory challenges were properly used, which can be overcome on a showing sufficient to support the inference that the challenges were so exercised as to exclude individuals on the basis of their group affiliation. *Id.* at 490. Factors in the assessment include not only the numbers and percentage of group members excluded, but also common group membership of the defendant and the jurors excluded, and of the victim and the remaining jurors. *Id.* Compare the figures given above with those in *Soares*: twelve of thirteen blacks were excluded there. While the defendant here was black

---

[4] As to the "adequacy" of the record, it lacks potentially relevant information such as the number of peremptory challenges used by the prosecutor to exclude white jurors. Compare *Commonwealth* v. *Walker*, 379 Mass. 297, 300 (1979).

as were three of the four excluded jurors, the victim of the crime was Oriental and none of the final jury was such. We doubt that a trial judge on this showing would have had a basis for finding that the peremptory challenges were used improperly. We would sustain a finding that the presumption of proper use was not rebutted. See *Commonwealth* v. *Walker*, 379 Mass. 297, 300-301 (1979).[5]

3. *Jury's role as to the degree of murder.* The trial judge instructed on two kinds of murder in the first degree, felony-murder and premeditated murder, and charged further that "[m]urder which does not appear to be murder in the first degree is murder in the second degree." He omitted, however, to read the jury the last sentence of the murder statute, G. L. c. 265, § 1: "The degree of murder shall be found by the jury."

In *Commonwealth* v. *Dickerson*, 372 Mass. 783 (1977), we held that it was proper for the judge in a case with facts like those at bar to submit the question of murder in the second degree to the jury, and to inform them of their authority under the statute to find the degree of murder. This was held correct even where arguably the facts would support only a finding of murder in the first degree, for the jury "within their power to appraise evidence selectively, might have accepted as credible enough evidence to establish a conviction of murder in the second degree, but might have declined to accept such further evidence as tended to prove a case of murder in the first degree." *Id.* at 795-796 (footnote omitted). We went on to outline a proper charge on murder and the degree of murder which comprised a reading of the murder statute, including the last sentence. *Id.* at 797-798 n.6.

In the present case counsel for the defendant excepted to the failure to charge on manslaughter, and on larceny in relation to the armed robbery charge (exceptions not argued

[5] Of course the present record does not come near presenting an equal protection claim under the doctrine of *Swain* v. *Alabama*, 380 U.S. 202 (1965).

on this appeal). There was no objection or exception to the judge's omission to refer in terms to the jury's power to find murder in the second degree. We held in *Commonwealth v. Hooks*, 375 Mass. 284, 290-292 (1978), that an inadequate instruction on murder in the second degree did not amount to reversible error when counsel failed to alert the judge by exception and when a finding of murder in the second degree would fail of support in the facts. *Hooks* foreshadows the result here. The defendant admitted participation in an armed robbery resulting in a homicide. His sole ground for possible acquittal was duress. Nothing in the facts looked to murder in the second degree. Compare *Commonwealth v. Rego*, 360 Mass. 385, 396-397 (1971). We may reverse for error that raises "a substantial risk of a miscarriage of justice" in the absence of exception (*Commonwealth v. Freeman*, 352 Mass. 556, 564 [1967]), but we think there is no such risk here stemming from the failure to charge in full under the statute.[6]

4. *Instruction on premeditation.* Here is another claimed error not objected or excepted to. The contention now made is that the facts, while supporting a coventured felony-murder, would not support premeditated murder, and so giving a charge on premeditation was error.

If the absence of exception is forgiven, there was still no error. Donna Horner's testimony, that the defendant confessed to her that he directed Ellis to shoot Shung Li, was sufficient to warrant an instruction on premeditation. We need not speculate whether the jury might take a view of the evidence, even apart from Horner, that could associate the defendant with Ellis's premeditated murder of Shung Li on a theory of joint enterprise or coventure. See *Commonwealth v. Richards*, 363 Mass. 299, 308-309 (1973).

5. *Reasonable doubt.* The defendant contends for the first time that the charge on reasonable doubt (the essence

---

[6] Similarly there is no basis for relief under G. L. c. 278, § 33E, on this account. See point 7 below and *Commonwealth v. Grace*, 381 Mass. 753, 756-758 (1980).

of which is set out in the margin[7]) was "momentary, fragmented and scanty." We think it was adequate. It stated that being satisfied beyond a reasonable doubt means having a "full and abiding conviction of the guilt of the defendant" after a "careful and candid and impartial consideration of all the evidence." This conformed to *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), which we cited recently as the best source for "unimpeachable" instructions on reasonable doubt. See *Commonwealth* v. *Ferreira*, 373 Mass. 116, 130 n.12 (1977). The remark in the judge's instruction about "doubt based on reason" is subject to the criticism made in *Commonwealth* v. *Bjorkman*, 364 Mass. 297, 308 (1973), and in *Commonwealth* v. *Hughes*, 380 Mass. 596, 598-602 (1980), but in both cases we thought that lapse itself should not be held fatal.[8] The same holds here when the charge is read as a whole. See *Commonwealth* v. *Garcia*, 379 Mass. 422, 441 n.12 (1980); *Commonwealth* v. *Kelley*, 359 Mass. 77, 92 (1971).

6. *Burden of proof in general, and as to duress.* The claim freshly made here, that the charge failed to place the general burden of proof clearly on the Commonwealth, is quite unsupported. At two points in the instructions the jury were told that the Commonwealth must prove beyond

---

[7] "Reasonable doubt, as the name implies, is a doubt based on reason, a doubt for which you can give a reason. It is such a doubt as would case [*sic*] a juror, after careful and candid and impartial consideration of all the evidence, to be so undecided that he can't say that he has an abiding conviction of the defendant's guilt. But if, after a careful, impartial consideration of all the evidence, you have a full and abiding conviction of the guilt of the defendant, then you are satisfied beyond a reasonable doubt. Otherwise, you are not so satisfied."

[8] See *Tsoumas* v. *New Hampshire*, 611 F.2d 412, 413-414 (1st Cir. 1980) (instruction that reasonable doubt must be "based on reason," although not "particularly recommend[ed]," held not reversible error); *Dunn* v. *Perrin*, 570 F.2d 21, 23 (1st Cir.), cert. denied, 437 U.S. 910 (1978) (charge that reasonable doubt must be based on "good and sufficient reason," standing alone, "might not be reversible error"); *United States* v. *MacDonald*, 455 F.2d 1259, 1262-1263 (1st Cir.), cert. denied, 406 U.S. 962 (1972) (charge that reasonable doubt is "doubt for which you can give a reason" criticized but held not reversible error).

a reasonable doubt all essential elements of the crimes charged. This burden was further explained in connection with the presumption of innocence, and the point was also driven home by a contrast between the Commonwealth's burden in a criminal trial and the preponderance burden borne by a party in a civil matter. Although some isolated comments in the charge on the defendant's privilege to remain silent and on the role of defense counsel could not be thought ideal, they did not shift any burden to the defendant or undercut the statements placing the general burden firmly on the Commonwealth.

We turn to the defendant's more serious contention, again not made the subject of an exception, that the instructions erroneously placed on him a burden of proof as to duress. As to the meaning of duress, the early case of *Commonwealth* v. *Elwell*, 2 Met. 190, 192 (1840), said merely that no "criminal will or purpose" could be implied from an act that was caused "by force or the compulsion of others." The theme has not been renewed in our modern cases,[9] and so we need say here that, in respect to serious crimes of the order involved in the present case,[10] "duress" is usually taken to require a present, immediate, and impending threat of such a nature as to induce a well-founded fear of death or of serious bodily injury if the criminal act is not done; the actor must have been so positioned as to have had no reasonable chance of escape. See *R.I. Recreation Center, Inc.* v. *Aetna Cas. & Sur. Co.*, 177 F.2d 603, 605

---

[9] *Commonwealth* v. *Barnes*, 369 Mass. 462 (1976), sustained the denial of a directed verdict of acquittal in a case where duress was raised by the defendant, *id.* at 467, but beyond a reference to *Commonwealth* v. *Elwell* the court did not find it necessary to articulate the elements of duress. The *Barnes* case noted but did not decide the issue whether *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975), demanded as a matter of due process that the Commonwealth negate duress beyond a reasonable doubt.

[10] As to varying the definition of duress with the nature of the crime, see Newman & Weitzer, Duress, Free Will and the Criminal Law, 30 S. Cal. L. Rev. 313, 329-330 (1957); *State* v. *Toscano*, 74 N.J. 421, 435-436 (1977).

(1st Cir. 1949); *Shannon* v. *United States*, 76 F.2d 490, 493 (10th Cir. 1935). See also Annot., Coercion, Compulsion, or Duress as a Defense to Criminal Prosecution, 40 A.L.R.2d 908, 910-911 (1955). He must have been put in a condition of mind where neither he nor a person of reasonable firmness could have acted otherwise in the circumstances. *United States* v. *Haskell*, 26 F. Cas. 207, 210 (C.C. E.D. Pa. 1823) (No. 15,321); *Powe* v. *State*, 176 Miss. 455, 461 (1936). See also Model Penal Code § 2.09(1) (Proposed Official Draft 1962).[11] The trial judge's instructions were essentially faithful to this description of duress and no serious challenge on that score is made now.[12]

The parties assumed, as did the trial judge in his memorandum, that in the state of the record the judge was obliged to instruct the jury on duress. That was correct, for "[t]he fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon." *Commonwealth* v. *Campbell*, 352 Mass. 387, 398 (1967), quoting from *People* v. *Carmen*, 36 Cal. 2d 768, 773 (1951). Also assumed were two more controversial points — that the defendant was entitled to an instruction on duress with respect to murder as well as the other crimes charged,[13] and that, under *Mullaney* v. *Wilbur*, 421 U.S.

---

[11] As to certain distinctions between the common law and Model Penal Code descriptions of duress, see Newman & Weitzer, *supra* at 315. Compare *D'Aquino* v. *United States*, 192 F.2d 338, 358-359 (9th Cir. 1951), cert. denied, 343 U.S. 935 (1952). (Tokyo Rose case), with *State* v. *Toscano*, 74 N.J. 421, 440-442 (1977); *People* v. *Pryor*, 70 App. Div. 2d 805, 806 (N.Y. 1979). The distinctions would be without importance in the present case.

It should be added that "duress" is not a refuge if the person places himself recklessly in a situation where the coercion will probably be applied. See *State* v. *Clay*, 220 Iowa 1191, 1203 (1935); Model Penal Code § 2.09(2) (Proposed Official Draft 1962). The judge in his instructions used the expression "willfully and willingly" in lieu of "recklessly," but the former expression was more generous to the defendant than the latter.

[12] The defendant complained, both at trial and on this appeal, that while the description of duress was essentially accurate, the judge stressed unduly the strictness or limits of the formula. We do not agree.

[13] At trial the prosecutor requested an instruction that duress could not be claimed as a defense to a homicide. This request was denied, and the contention has not been pressed further.

684 (1975), the Commonwealth bore the burden of negating duress beyond a reasonable doubt as a matter of due process. Thus it is from the viewpoint of our self-defense cases implementing *Mullaney*, for example, *Commonwealth* v. *Rodriguez*, 370 Mass. 684 (1976), and *Commonwealth* v. *Stokes*, 374 Mass. 583 (1978), that the parties and the trial judge have discussed the adequacy of the charge in casting the burden regarding duress, and the effect of a failure to take exception.

As to the first assumption, the common law doctrine was that murder (in some undifferentiated sense) remained punishable as such regardless of duress (see R. Perkins, Criminal Law 951 [1969]; Annot., *supra* at 909[14]), a posi-

---

[14] Blackstone held that a person under duress ought to choose "rather to die himself than escape by the murder of an innocent," see R. Perkins, Criminal Law 951 (1969), citing 4 W. Blackstone, Commentaries 30 (1769). This position evidently was influenced by religious belief. See G. Williams, Criminal Law § 246, at 760 (2d ed. 1961); Hitchler, Duress as a Defense in Criminal Cases, 4 Va. L. Rev. 519, 527 (1917).

As duress is available against a charge of armed robbery, see *United States* v. *Hearst*, 563 F.2d 1331, 1336 (9th Cir. 1977), cert. denied, 435 U.S. 1000 (1978); *State* v. *St. Clair*, 262 S.W.2d 25, 28 (Mo. 1953); *People* v. *Merhige*, 212 Mich. 601, 611 (1920), it would seem to follow that it should also apply to armed robbery eventuating in death, i.e., a felony-murder, especially since religious or ethical objections would be felt less strongly here than in a case of premeditated murder. See R. Perkins, supra at 952; Hitchler, *supra* at 529-530; *People* v. *Pantano*, 239 N.Y. 416, 418 (1925). But see *People* v. *Petro*, 13 Cal. App. 2d 245, 247-248 (1936); *State* v. *Moretti*, 66 Wash. 537, 540 (1912).

tion still taken in many[15] but not all[16] States that speak to the point by statute. The second assumption is troublesome because the standards applied in the cases following *Mullaney* are influenced by the fact that constitutional imperatives are conceived to be involved. Thus *Stokes, supra* at 591, defined a "constitutionally sufficient" instruction on burden of proof, and the decision there to review such instructions

[15] For States which by statute exclude duress as a defense to any crime punishable by death, see Cal. Pen. Code § 26(7) (West Supp. 1980); Idaho Code § 18-201(4) (1979); Ill. Ann. Stat. c. 38, § 7-11 (Smith-Hurd 1972); Mont. Crim. Code § 94-3-110 (1977); Nev. Rev. Stat. § 194.010(8) (1979).

For those that by statute exclude duress as a defense to certain serious offenses, see Ariz. Rev. Stat. Ann. § 13-412 (1978) (homicide or serious physical injury); Colo. Rev. Stat. § 18-1-708 (1978) (murder in the first degree); Ga. Code Ann. § 26-906 (1978) (murder); Ind. Code Ann. § 35-41-3-8 (West 1978); Iowa Code Ann. § 704.10 (West 1979) (intentional or reckless act causing physical injury); Kan. Stat. § 21-3209 (1974) (murder or voluntary manslaughter); Ky. Rev. Stat. § 501.090 (1975) (intentional homicide); La. Rev. Stat. Ann. § 14:18(6) (West 1974) (murder); Me. Rev. Stat. tit. 17-A § 54 (1980) (intentional or knowing homicide); Mo. Ann. Stat. § 562.071 (Vernon 1979) (murder); Or. Rev. Stat. § 161.270 (1979) (murder); Wash. Rev. Code Ann. § 9A.16.060 (1977) (murder or manslaughter).

[16] For States which by statute allow duress as a defense to any crime, including murder, see Ala. Code tit. § 13A-3-30 (Cum. Supp. 1980); Alas. Stat. § 11.81.440 (1978); Ark. Stat. Ann. § 41-208 (1977); Conn. Gen. Stat. § 53a-14 (1979); Del. Code tit. 11 § 431 (1979); Haw. Rev. Stat. § 702-231 (1976 & Supp. 1979); N.Y. Penal Law § 40.00 (McKinney 1975); N.D. Cent. Code § 12.1-05-10 (1976); Okla. Stat. Ann. tit. 21 §§ 152(7), 155, 156 (West 1958 & Cum. Supp. 1980); 18 Pa. Cons. Stat. § 309 (Purdon 1973); S.D. Compiled Laws Ann. § 22-5-1 (1979); Tex. Penal Code Ann. tit. 2, § 8.05 (Vernon 1974); Utah Code Ann. § 76-2-302 (1978).

Additionally, the following statutes allow duress to reduce a murder charge to manslaughter: Minn. Stat. Ann. §§ 609.08, 609.20(3) (West 1964). N.J. Stat. Ann. § 2C: 2-9 (West 1980). Wis. Stat. Ann. § 939.46 (West 1958).

See Note, 9 Seton Hall L. Rev. 556, 567 & nn.97-100, 568 (1978), from which our statutory references are in part derived.

The Model Penal Code § 2.09 (Proposed Official Draft 1962) brings all crimes within the range of duress. A sanction is thought to be unwarranted because, by definition, the actor (and a reasonable person in the circumstances) is deprived of free will and cannot be deterred by the prospect of future punishment. See Model Penal Code § 2.09, Comment at 5-7 (Tent. Draft No. 10, 1960).

despite the absence of exceptions in trials predating *Rodriguez* derived in part from the decision in *Hankerson* v. *North Carolina*, 432 U.S. 233, 241, 243 (1977), to give the constitutional right announced in *Mullaney* a retroactive effect. See *Stokes, supra* at 588-590. But perhaps duress should not fall into the same constitutional pattern as self-defense or comparable matters.

Due process requires that the State disprove beyond a reasonable doubt those "defenses" that negate essential elements of the crime charged. See *Patterson* v. *New York*, 432 U.S. 197, 210 (1977); *State* v. *Arpin*,　　R.I.　　, (1980) (410 A.2d 1340, 1350 [R.I. 1980]). See also *Mullaney, supra* at 705-706 (Rehnquist, J., concurring). This is a somewhat question-begging yet indicative canon. The defenses of provocation, self-defense, defense of others, a claim of "accident" — all are considered to go to the presence of "malice"; hence the State assumes the burden of disproof of each of them, where malice is an ingredient of the crime. See *Commonwealth* v. *Greene*, 372 Mass. 517, 518-519 (1977) (provocation); *Connolly* v. *Commonwealth*, 377 Mass. 527, 529-530 (1979) (self-defense); *Commonwealth* v. *Monico*, 373 Mass. 298, 304 (1977) (defense of others); *Lannon* v. *Commonwealth*, 379 Mass. 786, 790 (1980) (accident). Conceivably, however, duress is to be classified with insanity, the proof of which may, according to the Supreme Court, be fastened on the defendant without due process difficulties. See *Rivera* v. *Delaware*, 429 U.S. 877 (1978) (dismissing for want of a substantial Federal question a Delaware decision placing the burden as to insanity on the defendant); *Leland* v. *Oregon*, 343 U.S. 790, 799 (1952). See also *Mullaney, supra* at 705-706 (Rehnquist, J., concurring).[17] Yet if the effect of duress, as defined, is to reduce the person to a state of involuntariness or automatism, see Model Penal Code § 2.09, Comment at 6

---

[17] The Supreme Court has long held, however, that the rule for the Federal system, apart from constitutional considerations, is that the government bears the burden of negating insanity once the issue is raised. See *Davis* v. *United States*, 160 U.S. 469, 484 (1895).

(Tent. Draft No. 10, 1960), then duress may be seen as removing the very basis of criminal culpability, see Model Penal Code § 2.01(2)(d) (Proposed Official Draft 1962), with due process implications as regards burden of proof. See also *Sandstrom* v. *Montana*, 442 U.S. 510, 514-515 (1979) (due process requires that State bear the burden on "intent").[18]

In fact, a number of recent decisions, cited in the margin,[19] that place the burden regarding duress on the State, have done so on grounds derived from statute or other reasoning, and not because of supposed constitutional compulsion. One decision has put the burden on the defendant without adverting to any constitutional problem. *State* v. *Toscano*, 74 N.J. 421, 443 (1977).[20] Two other decisions

---

[18] For dictum placing the burden regarding duress on the State for due process reasons, see *State* v. *Evans*, 278 Md. 197, 207-209 (1976). But it may be argued that, whatever the coercion, the actor desires at the climactic moment the accomplishment of the criminal end even though he is actuated by an overwhelming desire to save himself; in this sense his act remains voluntary, and there is no lack of an essential criminal element. See G. Williams, Criminal Law § 242, at 751 (2d ed. 1961). See also *United States* v. *Bailey*, 444 U.S. 394, 410-411 (1980) (mens rea for purposes of the Federal crime of prison escape can coexist with claim of "duress or necessity"). Compare *People* v. *Condley*, 69 Cal. App. 3d 999, 1011-1013, cert. denied, 434 U.S. 988 (1977) (contrasts duress with "limited defense of necessity" to prison escape; concludes that "duress" negates mens rea, but that "necessity" does not).
A definition of duress in terms of a person of "reasonable firmness" moves the concept away from a pure inquiry into voluntariness. For the thesis that duress should look to the makeup of the particular individual threatened, see Newman & Weitzer, Duress, Free Will and the Criminal Law, 30 S. Cal. L. Rev. 313, 333-334 (1957); Fletcher, The Individualization of Excusing Conditions, 47 S. Cal. L. Rev. 1269, 1288-1293 (1974).

[19] See *United States* v. *Campbell*, 609 F.2d 922, 925 (8th Cir. 1979), cert. denied, 445 U.S. 918 (1980); *United States* v. *Hearst*, 563 F.2d 1331, 1336 n.2 (9th Cir. 1977), cert. denied, 435 U.S. 1000 (1978); *United States* v. *Johnson*, 516 F.2d 209, 212-213 (8th Cir.), cert. denied, 423 U.S. 859 (1975); *People* v. *Graham*, 57 Cal. App. 3d 238, 240 (1976); *State* v. *Moore*, 237 Ga. 269, 270 (1976); *People* v. *Aldridge*, 65 Ill. App. 3d 995, 1000 (1978); *People* v. *Field*, 28 Mich. App. 476, 478 (1970); *Esquibel* v. *State*, 91 N.M. 498, 501 (1978); *Moes* v. *State*, 91 Wis. 2d 756, 766 (1979).

[20] The majority in *Toscano* said duress was "open-ended"; much turns on "idiosyncrasies of an individual's temperament" (this despite the adop-

have reached the same result after dismissing constitutional objections, relying on *Patterson* v. *New York, supra.* See *Foraker* v. *State,* 394 A.2d 208, 214 (Del. 1978) (relying on *Goddard* v. *State,* 382 A.2d 238, 241 [Del. 1977], denial of writ of habeas corpus aff'd sub nom. *United States ex rel. Goddard* v. *Vaughn,* 614 F.2d 929 [3d Cir. 1980], which in turn relied on *Patterson*); *People* v. *Bevilacqua,* 56 App. Div. 2d 605, 606 (N.Y. 1977), rev'd on other grounds, 45 N.Y.2d 508 (1978). The *Patterson* case is read as leaving a neutral space of unsettled dimension in which a State's classification of a "defense," with burden-of-proof consequences, will be respected by the Supreme Court and held beyond constitutional impeachment.[21]

---

tion by the court of a "person of reasonable firmness" standard); there is a "possibility for abuse and uneven treatment." 74 N.J. at 443. A dissent argued that throwing the burden on the accused was an "unwarranted modification of the civilized concept of Anglo-American criminal law that it is the burden of the State to prove the guilt of the criminally accused beyond a reasonable doubt"; since duress necessarily negates culpable intent, the decision allowed the jury to convict a defendant because duress was not shown preponderantly even if they reserved some doubt as to the defendant's freedom from the coercive effects of duress. And evidence of duress is no more within the defendant's exclusive reach than evidence of other matters that the State must prove. *Id.* at 444-446.

[21] *Patterson* upheld the application of a New York statute requiring the defendant to shoulder the burden on "extreme emotional disturbance" which, if proved, reduced the crime of murder to manslaughter. The court looked to New York law for the definition both of the crime and the defense, 432 U.S. at 205-208, and concluded that the defendant could constitutionally bear the burden of proof because the defense did not negate an element of murder but merely reduced punishment. *Id.* at 206-210. *Patterson.* did not settle the question how far the State can constitutionally redefine traditional elements of crime, such as intent, as elements of defense, and thus place a burden on the defendant, but it suggested there were some due process limits. *Id.* at 210.

*Moes* v. *State,* 91 Wis. 2d 756, 768 (1979), although it held under a Wisconsin statute that the State bore the burden as to duress, also concluded, in reliance on *Patterson,* that the Federal Constitution did not compel that burden placement. It justified the latter conclusion by a quotation from *People* v. *Graham,* 119 Cal. Rptr. 614, 616 (Ct. App. 1975), that "[t]he defense of duress does not negate an element of the crime [of robbery]." *Graham,* however, had been vacated in *People* v. *Graham,* 57 Cal. App. 3d 238 (1976).

Our assignment of the burden of proof to the State with respect to insanity (*Commonwealth* v. *Kostka*, 370 Mass. 516, 531-532 [1976]), alibi (*Commonwealth* v. *Leaster*, 362 Mass. 407, 416-417 [1972]), and entrapment (*Commonwealth* v. *Miller*, 361 Mass. 644, 651-652 [1972]) — all without reliance on the Constitution — suggests that we might do the same with duress. But this does not mean that we would scrutinize a charge as rigorously, or waive the failure to take exception to the charge as readily, as we have done in our self-defense decisions where the Constitution was in the foreground.

For purposes of the present case we are content to assume, without deciding, that duress was available to meet a charge of homicide,[22] and that the burden of disproving duress beyond a reasonable doubt was upon the Commonwealth as a matter of constitutional law (as that impinged on a trial in the post-*Mullaney*, pre-*Rodriguez* era).[23] Thus we grant the defendant, but only arguendo, the best of legal climates. On that basis we find that the instructions on the duress-burden were adequate.

There was no explicit instruction that the Commonwealth bore the burden of negating duress beyond a reasonable doubt. But *Stokes, supra* at 591, indicated, in the con-

---

[22] The present case may raise only the issue of duress with respect to felony murder, discussed at note 14 above. The evidence we think sufficient to require an instruction on premeditated murder — the express encouragement to Ellis to shoot attributed to the defendant by Donna Horner (point 4 above) — is denied by the defendant rather than rebutted through a claim of duress. Otherwise the participation which the defendant acknowledges, but explains by duress, possibly does not attain to the level that would lend support to premeditated murder on a theory of joint venture with Ellis. See *Commonwealth* v. *Richards*, 363 Mass. 299, 308 (1973).

[23] The trial here occurred in April, 1976, between the *Mullaney* and *Rodriguez* decisions. This court brings "greater expectations" and consequently "more careful scrutiny" to judges' instructions in trials postdating *Mullaney* and especially *Rodriguez*, see *Commonwealth* v. *Stokes*, 374 Mass. 583, 591 (1978), although counsel are then under heavier responsibility to take exceptions at trial to faulty instructions. See *Commonwealth* v. *Medina*, 380 Mass. 565, 577 n.5 (1980).

text of self-defense, that a charge could be constitutionally sufficient if it "clearly placed the burden of proving malice beyond a reasonable doubt on the Commonwealth and contained other discussion which, although not referring to the burden of proof as to self-defense and reasonable provocation, adequately defined those factors and established them as negating a finding of malice." These words in *Stokes* followed from the indication in *Rodriguez* that the "critical" part of a constitutionally sufficient charge was that a "nexus" be established between the elements of the crime charged, and the absence of the particular defense. See *Rodriguez, supra* at 691; *Connolly* v. *Commonwealth, supra* at 529-530, 531. The instructions in the present case required the Commonwealth to prove voluntariness: the Commonwealth must, according to the charge, shoulder the burden as to all essential elements of the crimes charged, and criminal intent (which subsumes voluntariness, an absence of duress, see *People* v. *Tewksbury,* 15 Cal. 3d 953, 964 n.9, cert. denied, 429 U.S. 805 [1976]) was such an element. The charge made the "critical nexus" in the following passage: "Perhaps I should say this: that the exercise of free will is essential to the commission of a criminal act. Criminality does not attach to an act committed under duress, if the actor had no free will, because if he had no free will he could have no criminal intent." The charge here is rather like the one found adequate in *Gagne* v. *Commonwealth,* 375 Mass. 417 (1978). *Gagne* followed *Stokes* in upholding a charge in which the judge did not instruct in terms that the burden of disproving provocation was on the Commonwealth, but rather instructed that the Commonwealth must prove every essential element of the crime charged, that malice was an essential element, and that a legal justification or excuse, such as provocation, negated malice. *Id.* at 421. See also *Commonwealth* v. *Peters,* 372 Mass. 319, 319-325 (1977) (charge sufficient which makes malice and provocation "mutually exclusive").

There were remarks in the charge which, independently considered, might imply some burden on the defendant. We

comment on these although the defendant does not single them out for attack in his argument on this appeal. They included statements that the jury must "determine whether in this case there was . . . coercion or duress," and that "the defense is not available" to a person in certain circumstances. Similar language in other cases has been deplored. *Rodriguez, supra* at 690, criticized a statement that the jury must "determine whether or not" the defense of self-defense existed; *Commonwealth* v. *Harrington*, 379 Mass. 446, 453-454 (1980), saw difficulties with language that "[s]elf-defense is available to a defendant only under [certain] circumstances," and is never "available" to an agressor.[24] But the charge held insufficient in *Rodriguez* contained additional, more troublesome language about the jury "find[ing]" or being "satisfied" that the evidence supported self-defense, see *Rodriguez, supra* at 690. See also *Connolly* v. *Commonwealth, supra* at 533-535 (reversing for charge repeatedly using "finding" language); *Commonwealth* v. *Collins*, 374 Mass. 596, 600 (1978) (holding insufficient instructions that defendant "seeks to establish" self-defense); *Commonwealth* v. *Stokes, supra* at 592 n.5 (reversing for charge asking whether evidence was "enough to justify" provocation). And the charge in *Harrington* was held inadequate not only because of its language above quoted, but also because it failed to make the "critical nexus": it "failed to define self-defense adequately or to explain its significance with reference to the question of malice." *Harrington, supra* 453-454. The charge at bar shares neither of these characteristics. We think any questionable remarks were overcome by the charge as a whole which was sufficient to inform the jury about their true duty. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 481 (1980). See also *Commonwealth* v.

---

[24] Use of the word "defense" has been thought misleading because it implies that the defendant bears a burden of persuasion rather than merely that of introducing some evidence of the matter. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 481 (1980); *Connolly* v. *Commonwealth*, 377 Mass. 527, 533 (1979); *Commonwealth* v. *McLeod*, 367 Mass. 500, 502 (1975).

*Grace*, 381 Mass. 753, 758-759 (1980). Cf. *Reddick v. Commonwealth*, 381 Mass. 398, 406 (1980); *Commonwealth v. Fitzgerald*, 380 Mass. 840, 843 (1980); *Gibson v. Commonwealth*, 377 Mass. 539, 543 (1979).[25]

7. *Section 33E considerations.* We have chosen to assume the obligation of examining this record as upon review under G. L. c. 278, § 33E, although the defendant does not assert that he is entitled to such review. (Some claim to § 33E treatment could perhaps be made on the ground that the appeal was not completed and this is the first opportunity to apply the statute. See *Commonwealth v. Smith*, 381 Mass. 141, 146-147 [1980].) On this basis we find no reason to order a new trial or reduce the verdict. The jury could well find that the entire plea of duress was a fictional contrivance by the defendant and that it was disproved by the Commonwealth beyond a reasonable doubt. What is left is a murder and other crimes in which the defendant joined from beginning to end, from assistance in procuring the weapon to the flight from the restaurant with the avails in his pocket.

*Order denying motion for a new trial affirmed.*

---

[25] Defense counsel, in his motion for a directed verdict of acquittal and in conversation with the trial judge about the jury instructions, indicated his view that the Commonwealth had the burden on duress. After listening to the entire charge he seemed content, for he took no objection.

The defendant mentions two remarks by the judge suggesting incautiously that the jury might not have to reach the issue of duress. After objection, the judge gave an instruction which served to correct any misimpression the remarks might have created.