# DECISIONS

### OF THE

## APPEALS COURT

### OF

## MASSACHUSETTS

---

COMMONWEALTH vs. LAWRENCE E. STANTON.

Middlesex. September 21, 1983. — October 20, 1983.

Present: BROWN, KAPLAN, & GREANEY, JJ.

*Assault and Battery. Judge. Evidence,* Photograph, Cross-examination, Consciousness of guilt. *Practice, Criminal,* Instructions to jury. *Jury and Jurors.*

Certain humorous comments made by the judge during the jury trial of a criminal case, none of which were directed at the defendant, did not deprive the defendant of a fair trial on the ground that the remarks created an atmosphere of levity which could have led the jury to make undeserved findings of guilty. [4-5] BROWN, J., concurring.

At a criminal trial, there was no prejudicial error in the judge's admitting in evidence a full face, "sanitized" picture of the defendant, alleged to have suggested that the defendant had a criminal record, inasmuch as the defendant chose to testify and his criminal convictions were offered on cross-examination to impeach his credibility. [5]

At the trial of an indictment charging assault with a dangerous weapon, a tire iron, arising out of a traffic incident, no prejudice resulted from the prosecutor's asking during cross-examination of a defense witness, as bearing on the witness's bias, whether he reported the matter to police, even though, as a passenger in the defendant's vehicle, the witness had no duty to make any report. [5-6]

An unobjected-to remark made by the judge at the trial of a criminal case prior to his charging the jury, alleged on appeal to have trivialized the definition of reasonable doubt established in *Commonwealth v. Webster,* 5 Cush. 295, 320 (1850), did not require reversal of the

defendant's conviction of assault and battery, where the judge read from the *Webster* opinion and thereafter defined reasonable doubt in his own words equivalent in substance to the definition in *Webster*. [6-7]

At the trial of an indictment charging assault with a dangerous weapon, a tire iron, arising out of a traffic incident, the judge was not required to instruct the jury that evidence indicating the defendant's consciousness of guilt might relate only to injury to the other automobile, rather than personal injury to the driver of that vehicle. [7]

A judge's remarks at the conclusion of his charge to the jury in a criminal case, although better omitted, could not be taken to have urged excessive speed or to have set a deadline by which the jury was to reach a verdict. [7]

INDICTMENT found and returned in the Superior Court Department on March 10, 1981.

The case was tried before *Garrity*, J.

*Susan G. Kauffman* for the defendant.

*David P. Linsky*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Reading this transcript critically, one could wish for more circumspection on the part of the trial judge, but one emerges, nevertheless, with the clear view that no such error was committed as could call for reversal of the judgment.

The defendant Lawrence E. Stanton was charged by indictment with (i) assault and battery by means of a dangerous weapon, to wit, a tire iron, upon Aaron Soltes; (ii) assault with a dangerous weapon, an automobile, upon Soltes; (iii) the same, upon Joshua Hurwitz; and (iv) going away and failing to report after a motor vehicle collision on a public highway. A jury found the defendant guilty of the first and fourth charges, and acquitted him of the second and third. The judge sentenced him on the first offense; the conviction on the fourth charge was placed on file.

The jury could have found the facts as testified to by the Commonwealth's witnesses, notably Soltes and Hurwitz. On November 1, 1980, about 3:00 P.M., Soltes was driving his 1970 Dodge Dart, with Hurwitz in the passenger seat, in

a northerly direction on South Street, Waltham.[1]  Traffic was stopped at a crossing because of construction work, and Soltes was obliged (as were other drivers in line) to do a U turn and proceed in an opposite direction on the same two-lane road.  Shortly Soltes had to halt to allow two elderly people to cross.  As he did so, the car behind, a 1966 Buick LeSabre driven by the defendant, began loud and repeated honking.  Soltes left his vehicle, approached the defendant, and asked what was the problem.  The defendant, without leaving his car, said this was not a parking lot. Soltes mentioned the elderly couple and returned to his car and drove off.  The defendant followed.  A half minute later, the defendant "gunned" his car and passed Soltes.  A quarter of a mile further, the defendant's car was at rest or slowed in the middle of the road, so Soltes had to go around the vehicle.  Again the defendant gunned his car and passed Soltes.  At the junction of Rivers Street (a continuation of South Street) and Summer Street in Weston, the defendant turned left on Rivers while Soltes went to the right on Summer.  Perceiving this, the defendant stopped, backed his car, and followed Soltes on Summer.  Coming alongside Soltes, the defendant crowded him and sideswiped the left front fender of his car, denting it.  Soltes stopped; the defendant passed him and stopped ten or twelve yards ahead.

Leaving his car with a tire iron in his right hand, the defendant approached Soltes's car on the driver's side. Soltes and Hurwitz ran up the car windows.  At close quarters, the defendant threw the tire iron against the driver's window shattering it and striking Soltes in the area of his left eye.  The defendant, going back to his car, turned down the license plate so as to conceal the license number.  Then he drove away.

Hurwitz, who was a physician, after inspecting Soltes's eye, took over the driving and brought Soltes to the Waltham Hospital.  A plastic surgeon applied some thirty su-

---

[1] We use the street names mentioned by the witnesses without correction to the official designations.

tures to the lacerations above and below the eye. Fragments of glass had lodged in the forehead and scalp. At the time of trial Soltes still complained of an impairment of sight and some numbness of his forehead.

Soltes and Hurwitz had in fact seen and were able to record the license number of the defendant's car (which, as it later appeared, was registered to the defendant). The police showed them, separately, an array of mugshots of seven or eight men and each selected the defendant's picture. The tire iron was found in Soltes's car.

Such was the substance of the Commonwealth's case. The defendant took the stand to tell a different story beginning with an account of insulting remarks by Soltes at the South Street encounter; describing differently the movements of the cars; suggesting that Soltes was responsible for any collision; and protesting that the defendant's tracking of Soltes was for the purpose of getting him to stop and exchange papers about the damage to the defendant's car (the defendant spoke of two contacts, the first early in the sequence). The defendant admitted he had thrown the tire iron at the closed window. He had been "antagonized," he said, by Soltes's refusal to stop and parley. He admitted turning the license plate.

Ralph Kouyoumjian, who from boyhood knew the defendant, was one of three passengers in the defendant's car. Called by the defense, he gave a muddled account of the course from South Street. According to this witness, the defendant had walked toward Soltes swinging the tire iron and it was by accident that it struck the car window.

1. It is first contended on the appeal that the defendant was denied a fair trial because various pleasantries by the judge created an atmosphere of levity that could have led the jury to make undeserved findings of guilt. No objection was taken, but the defendant points to the likely embarrassment of counsel in mentioning such a grievance to an offending judge. See *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846 (1980) (also suggesting the possibility of objection out of the jury's hearing). We have examined the

transcript with abundant care and believe the complaint to be much overdrawn. The judge at several points made humorous sallies of the robustious type that could have scored with the jury, although they might easily have resisted the impulse to be amused.[2] But it seems to us unlikely in the extreme that the jury became so intoxicated by the fun as to fail in their duties. Indeed the judge reminded them repeatedly of the importance of their fact-finding function.

2. Over objection, a full face, "sanitized" picture of the defendant, the one selected by Soltes and Hurwitz, was received in evidence at the instance of the Commonwealth. The defendant argues that this was unnecessry, as the parties were prepared to stipulate to the fact of such selection and there was no issue of identification. Cf. *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 309 (1979). The record colloquy about a stipulation seems unclear. The sense of it may have been that the array need not be introduced; only the chosen picture would be. However, we need not dwell on the matter in detail. The claimed prejudice to the defendant must arise from the picture's suggesting, despite its being sanitized, that the defendant had a criminal record. But the defendant chose to testify and his criminal convictions were offered on cross-examination to impeach his credibility.[3] Thus any possible prejudice on account of the picture fell away. See *Commonwealth* v. *Whitehead*, 379 Mass. 640, 660 (1980). It cannot be supposed on the present record that the defendant was somehow impelled to take the stand because of the introduction of the picture.

3. On cross-examination of Kouyoumjian, he was asked whether he had reported "the accident" to the police. There was objection (overruled) on the ground that, as a passenger, not the driver, this witness was not bound under

---

[2] None of the remarks was directed against the defendant. Compare *United States* v. *Hickman*, 592 F.2d 931, 934-936 (6th Cir. 1979).

[3] The judge was careful so to limit the evidential use of the convictions.

the statute to make a report, and the question was misleading because it suggested that he was so bound. The Commonwealth argued that the question was proper as bearing on the witness's bias. It is hard to defend the question on the theory that it was some proof of bias that the witness did not make a report even though he was not bound to do it, or on the theory that the question covered more than the statutory report and also comprised an inquiry into the witness's failure to report to the police the apparent crime of violence that he had observed. But so far had the witness's bias been indicated, not only by his life-long tie to the defendant, but also by his invention of a casual slip of the defendant's hand despite the defendant's own admission of criminal intention,[4] that any error in admitting the question and the negative answer appears trivial.

4. As a preface to charging on reasonable doubt by reading from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), the judge allowed himself the remark that he did not "necessarily want to read to you from a judgment 132 years old," but that was the will of the Commonwealth's highest court.[5] This drew no objection from the defense, but there is argument now that the judge's words trivialized the famous definition and might have suggested to the jury that they could disregard it. We think the jury would have understood the remark as referring to the old-fashioned style, rather than the substance, of *Webster*. At all events the judge went on to define reasonable doubt in his own words equivalent in substance to *Webster*; indeed he had

---

[4] Conceivably the question could have been defended as attacking on cross-examination the truth of the witness's testimony about a merely accidental impact of the tire iron: if that account was true, it was exculpatory, and the witness might be expected to report it voluntarily to the police. However, the Commonwealth did not attempt to make the point.

[5] There is an obligation to charge the essence of *Webster* but there may be deviation from its exact language. See *Commonwealth* v. *Ferreira*, 373 Mass. 116, 130 n.12 (1977); *Commonwealth* v. *Robinson*, 382 Mass. 189, 197-198 (1981).

introduced the jury to this concept (and to the presumption of innocence) even before proof was taken. We think the jury was well informed.

5. Concealment of the license number tended to show consciousness of guilt, and the judge instructed the jury about it. He denied a request of counsel to say — reflecting the line taken in the defendant's testimony where he admitted an intention to damage the car, but not the driver — that the jury might see fit to construe the license plate incident as showing consciousness of guilt as to injury to the property, but not to the person.[6] There is something in this, but the jury knew the defendant's attempted distinction and could reason from it to the issue of awareness of guilt — little as that issue need count in light of the plain proof of the main facts.

6. When the judge concluded his charge at 12:45 P.M. of the last day of trial, he said the jury "hopefully" would have their verdict by court closing time, four o'clock that afternoon, but of course they could keep on deliberating; in no case would they be sequestered overnight; and if necessary they would resume deliberation the following morning. In fact the court was called to order at 4:10 P.M. and the jury's verdict was then received. Although no objection was registered below, the defense now tries to treat these circumstances as one would a hurried verdict following an aggravated form of the now discredited "dynamite" charge. See *United States* v. *Flannery,* 451 F.2d 880, 883-884 (1st Cir. 1971). We do not read the judge's remarks as urging excessive speed or setting any deadline; it is indicative that the judge suggested the jury might well refrain from discussing the case at lunch. The jury did not behave as if pressed or panicked; they did not render a package verdict but rationally distinguished the first from the second and third charges.

---

[6] The defendant does not criticize the instruction by which intention to damage the car could carry over to the foreseeable wounding of Soltes.

To conclude. The judge might have done better to contain the exuberance of his humor; to accept a stipulation in lieu of sanitizing and receiving the picture if it became clear that the parties agreed to that course; to disallow the question to the defense witness, as framed, about failing to report the accident; to refrain from his petulant introduction of the *Webster* charge; to go somewhat further in his charge about consciousness of guilt; and to remove any hint of even a hope for a verdict by 4:00 p.m. Yet this is one of that class of cases where, "when all is said and done, the conviction is sure that the error[s] did not influence the jury, or had but very slight effect"; and so "the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of [the legislature]." Rutledge, J., in *Kotteakos* v. *United States*, 328 U.S. 750, 764-765 (1946). See also *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 444-446 (1983).

*Judgment affirmed.*

BROWN, J. (concurring). I concur, albeit reluctantly. Because the defendant testified that he had thrown the tire iron at the closed window I am able to conclude that the conduct of the judge could not possibly have affected the jury's verdict. But this does not end the matter.

As a general rule, judicial credibility is directly proportional to judicial solemnity. On occasion some unforced humor in moderation may relieve tension and even enhance the climate of the courtroom, but it seems to me that the levity in this particular drama most certainly was missed by the defendant, the one person who had anything of critical importance at stake.

All defendants are entitled to a trial which "all parties should hope and strive to make impeccable [citation omitted], but which at least must not be unfair." *Commonwealth* v. *Paiva*, 16 Mass. App. Ct. 561, 563 (1983). That imperative is as applicable to judges as it is to the

Commonwealth. Cf. *Commonwealth* v. *Sylvester,* 13 Mass. App. Ct. 360, 372 (1982) (Brown, J., concurring), S.C. 388 Mass. 749 (1983). Judges are held to a very high standard, and sailing "unnecessarily close to wind" (*Commonwealth* v. *Redmond,* 370 Mass. 591, 597 [1976]) is not only risky but is bad business. Fortunately, this time, "the paramount interest of the public in justice was [not] scuttled." *Commonwealth* v. *Ryan,* 8 Mass. App. Ct. 941, 942 (1979).

Suffice to say here that judges must adhere to their duty to keep the trial on an orderly course and to avoid prejudicial occurrences. *Commonwealth* v. *Mosby,* 11 Mass. App. Ct. 1, 17 (1980). Nor should they allow the proceedings to take on a farcical or whimsical aura. See generally Lummus, The Trial Judge (1937). It cannot be gainsaid that a judge should take care to behave himself. Cf. *Commonwealth* v. *Tirrell,* 382 Mass. 502, 513 (1981) (Kaplan, J., dissenting).