## R. I. RECREATION CENTER, Inc. v. ÆTNA CASUALTY & SURETY CO.

### No. 4437.

United States Court of Appeals
First Circuit.

Nov. 3, 1949.

Abraham Belilove, Providence, R. I., (Arcaro, Carty & Belilove, Providence, R. I., with him on brief), for appellant.

Matthew W. Goring, Providence, R. I., (S. Everett Wilkins, Jr., and Hinckley, Allen, Tillinghast & Wheeler, of Providence, R. I., with him on brief), for appellee.

604

**WOODBURY, Circuit Judge.**

The plaintiff in an action* brought to recover on a Comprehensive Dishonesty, Disappearance and Destruction policy of insurance, has taken this appeal from a final judgment entered for the defendant on its motion for summary judgment under Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A.

The policy in suit, which it is conceded was in force when the plaintiff's admitted loss of $3,800 in currency occurred, contains five insuring agreements, only one of which (Insuring Agreement II) was ever in effect; the plaintiff not having purchased coverage under any of the others. This agreement in pertinent part provides for payment up to the limit of the liability assumed, ($4,000) for loss of "Money and Securities" occurring within the insured's premises "caused by the actual destruction, disappearance or wrongful abstraction thereof", except "loss, damage or destruction caused or contributed to by * * * any dishonest, fraudulent or criminal act, * * * committed by any Employee, director or trustee of the Assured, whether acting alone or in collusion with others."

█ After the action was brought and removed to the court below and the defendant had filed its answer, counsel for the defendant took the depositions of the plaintiff's general manager and manager pursuant to Rule 26, F.R.C.P. Then it moved for summary judgment on the basis of the pleadings on file and the depositions which had been taken and the plaintiff countered with a cross-motion for summary judgment on the same basis. Hence for present purposes we take the statements made in the depositions at face value. From them it appears that the plaintiff's loss occurred under the following circumstances.

The plaintiff's general manager and its manager, Joseph A. Sullivan and Edward H. Sullivan respectively, are brothers. Edward as manager had custody of the plaintiff's funds which he kept in a safe on the premises of the corporation. Neither he nor his brother had authority to borrow corporate funds or to make any use of them for their personal needs or purposes.

About two o'clock in the morning of April 23, 1947, Edward received a telephone call from his brother Joseph's wife asking him to meet his brother in front of a hotel in Pawtucket. Edward complied and arriving at the hotel saw his brother's car parked in front of it. He drove up behind his brother's car and got out, whereupon he was confronted by an armed stranger in dark glasses who ordered him into the back seat of his brother's car. As he complied another armed stranger got in beside him from the opposite side, and the two searched him and then disclosed their plan. This was to drive him in his own car to the premises of the plaintiff corporation in Providence, where he was to enter, take all the money out of the safe, and turn it over to them. He was told that if he did not do as directed "they would take care of" his brother and his wife and "would not forget" him later on, and further "that they would take care of" his child also. During this conversation Joseph sat on the front seat with his wife and another armed stranger but did not speak and Edward was not allowed to speak to him. Apparently a fourth armed stranger was also present.

Following these events the two who had searched Edward and given him his orders, leaving Joseph and his wife with the other two unknowns in Joseph's car, drove Edward in his car to the corporation's place of business and there let him out and drove away. Edward then rapped on the window with his key to call one of the three employees of the corporation who were in the premises cleaning up, and one of them admitted him. He said nothing to this employee, or to either of the other two, but went directly to the office, where there was a telephone, unlocked the safe and removed all the money in bills from it leaving only some silver. He did not count the bills but putting them in a deposit bag he immediately left the office and walked along

* The action was brought originally in the Superior Court of the State of Rhode Island but was removed by the defendant to the court below there being the requisite diversity of citizenship and amount in controversy.

Main Street into Pawtucket as directed. After he had walked a mile or so the two strangers drove up in his car, ordered him into it, and drove off. They at once relieved Edward of the deposit bag in which he had placed' the money and then drove around for a time, eventually meeting Joseph in his car with his wife and their two guards. The four unknowns then ordered Edward out, gave him the key to his brother's car, told him to wait five minutes while they escaped, and then drove off in his car after letting him know where he would find it later. Edward waited as directed, then went and found his car, and only after that reported the night's proceedings to the police.

The defendant contends that applying settled principles of law to the facts outlined above Edward could not be found to have been acting under coercion when he took the plaintiff's money out of its safe. Hence it says that although the plaintiff might have insured against its loss had it seen fit to broaden the scope of its coverage by taking out insurance under other insuring agreements in the policy, its loss was not covered by Insuring Agreement II since it was caused or contributed to by the criminal act of an employee. The plaintiff, on the other hand, takes the position that the agreed facts at least provide a basis for finding that when Edward took the money he was acting under coercion, as that term is defined in the law, and thus in doing so was but the innocent tool or instrumentality of the bandits. Hence it says, in the event of a finding of coercion, it would follow as a matter of law that Edward was innocent of any dishonest fraudulent or criminal act with the result that its loss was clearly covered by Insuring Agreement II of the policy.

■ Barring cases involving children, wives, and mental defectives, there do not seem to be many cases in point. It appears to be established, however, that although coercion or necessity will never excuse taking the life of an innocent person, it will excuse lesser crimes. But to provide an excuse the compulsion must be present, immediate and impending, and of such a nature as to induce a well founded fear of death or at least serious bodily injury. And there must be no reasonable opportunity to escape the compulsion without committing the crime. See 22 C.J.S., Criminal Law, § 44; 15 Am.Jur., Criminal Law, § 318. The general rule, with citation of state cases, is well summarized in Shannon v. United States, 10 Cir., 76 F.2d 490, 493, in which it is said: "Coercion which will excuse the commission of a criminal act must be immediate and of such nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. One who has full opportunity to avoid the act without danger of that kind cannot invoke the doctrine of coercion and is not entitled to an instruction submitting that question to the jury."

■ Literally applying the foregoing principles to the conceded facts there can be no doubt that the plaintiff has not established a factual basis for the finding that Edward was acting under coercion when he took the money. Obviously it did not suit the bandits' purposes to shoot the Sullivans down in the street in front of a hotel in a city of substantial size if they should prove recalcitrant for their only threat was of future reprisal. And a veiled threat of future unspecified harm, as the threat "to take care of", and "not to forget" is not the equivalent of an immediate threat of death or severe bodily injury. But perhaps the law of coercion developed in a tougher-minded age, and now-a-days its severity should be relaxed. Although we are not aware of any supporting authority, maybe we ought to hold that under the circumstances it could be found that the vague menace of future injury of some unspecified sort was enough to induce in Edward a well founded present fear of future death or serious physical harm. But however this may be, the fact remains that Edward did not take the money out of the plaintiff's safe under the muzzles of the bandits' guns. See Nall v. Commonwealth, 208 Ky. 700, 271 S.W. 1059. He was left free while he was in the building to communicate his plight to the employee who had let him in, or to one or both of the other night workers there, and to enlist their aid, and he was free to telephone the police himself, and

certainly while he was opening the safe, taking out the money and walking over a mile to his rendezvous with the bandits there was ample time for the police to provide him with protection. Under these circumstances we do not see how it could be found that Edward did not have full opportunity to avoid the criminal act without present danger to himself.

But, calling the bandits "gangsters", the plaintiff argues that Edward acted throughout in present and reasonable fear of reprisal should he fail to do as directed. This argument rests upon the pre-supposition that the local police would be powerless to protect him, his family, and his brother and his family, from such revenge as the bandits, if disappointed, might attempt to take. In the first place there is nothing to indicate the work of a "gang", as that term has come to be used in recent years. Indeed the crime is not typical of "gangsters", who ordinarily seek larger game by more subtle means, but of ordinary bandits. And in the second place there is no basis for the assumption that the police of Providence or Pawtucket, both populous civilized communities, would be unable to afford adequate protection against any revenge which persons of that ilk, or even "gangsters", would be likely to attempt or to accomplish. We think Edward's reputed fear of future reprisal, under the circumstances disclosed, cannot reasonably be said to have been well founded, and thus that it is not the kind of fear necessary to establish the excuse of coercion.

Furthermore, however, the plaintiff argues that Edward was deterred from calling the police earlier than he did, not alone by fear of future reprisals upon himself and members of his family, but by fear that if he called for police protection while his brother and sister-in-law were still under guard, one or both of them might be killed or injured either by the bandits, or in a gun battle between the bandits and the police. Perhaps a well-grounded apprehension of death or serious bodily injury to another, particularly to a close relative, may constitute coercion. We are not prepared to hold otherwise. But we cannot see how it could be said that Edward's fear for the immediate safety of his brother and sister-in-law was well founded. As already pointed out, it did not suit the bandits' purposes to shoot in the public streets, and we do not see how Edward could have entertained a well founded fear that the bandits would murder his brother and sister-in-law in cold blood in a public place should he disappoint them. The remainder of the argument rests upon the pre-supposition that there would inevitably be a gun battle with the bandits should the police attempt to rescue Joseph and his wife from their custody. We do not see any adequate basis for this. Knowing the facts, it is certain that the police would not risk an open battle with the bandits in order to save their innocent captives, but instead would resort to safer and subtler means to attain their end. It seems to us abundantly clear that Edward had not only a reasonable but an ample opportunity to escape the bandits' compulsion without taking the plaintiff's money.

Therefore on the conceded evidentiary facts we fail to find any basis for the ultimate conclusion that Edward was acting under legal coercion when he took the money. Under these circumstances, should that evidence be submitted to a jury, the court below would have no alternative but to direct a verdict for the defendant. In this situation there is no genuine issue of material fact for trial and summary judgment is in order. See Sartor v. Arkansas Gas Corp., 321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967.

The judgment of the District Court is affirmed.

MAGRUDER, Chief Judge.

The opinion of the court assumes that, in respect of crimes like larceny, embezzlement, and other lesser offenses, the defense of coercion is available to an accused when he can show that he acted under compulsion of a well-grounded apprehension of death or serious bodily injury either to himself or to a near relative if he should refrain from committing the otherwise criminal act. As to fear for the bodily safety of a third person, even a close relative, there is a surprising dearth of authority; but if the question were ever presented under sufficiently

strong, dramatic and convincing circumstances, I am fairly sure the courts would sanction the defense of coercion. However that may be, the present is not a criminal case, but involves the application of language in an insurance policy. If Edward Sullivan took the money of his employer in compliance with the demand of the criminal gang, knowing that his brother had been abducted and was being held as a hostage by the gang, having a reasonable fear that his brother would be "done in" by the gangsters if the money were not forthcoming, and not daring to run the risks which would be involved in notifying the police, then I would say that the loss claimed here by the insured was not a loss "caused or contributed to by * * * any dishonest, fraudulent or criminal act", committed by an employee, within the meaning of the insurance contract. Of course, the rather lurid tale recited in the depositions may have been only a cock-and-bull story, but its credibility was for the jury. My only doubt is whether the case should have been disposed of on summary judgment, instead of being submitted to the jury under appropriate instructions as to coercion. For present purposes, not only must the facts recited in the depositions be taken as true, but every reasonable inference therefrom must be taken in favor of the insured. When Edward Sullivan left to get the money, his brother and sister-in-law were being held captive at gun point. Edward had no assurance that the gangsters who held his brother would remain parked on a public street in front of a hotel. They might have driven off to a hide-out with their hostages, so far as Edward could have known when he entered the premises of the insured to get the money. It is not necessary to assume that if the gangsters should have had occasion to do violence to their hostages they would do so in a public place. A hostage abducted and held by an armed gang of desperadoes is under a present impending menace, I should say, not merely under apprehension of possible future harm. I would have been inclined to the view that it was for the jury to say, accepting the facts as stated in the depositions, whether the risks to the hostages involved in any alternative course of action Edward might have taken were so insubstantial as to make it unreasonable for Edward to comply with the demands of the criminal gang. But my brethren think otherwise on this point, and I do not feel strongly enough about it to register a dissent.

One side issue is perhaps worthy of mention. Even if Edward would not be liable criminally for taking his employer's money under the circumstances, it does not necessarily follow that he would not be liable civilly to his employer for the value of the property taken to remove a menace to his own bodily safety or that of his brother. See American Law Institute, Restatement of Restitution § 122 Com.(b). If the insurance company were held liable to the insured for the loss here, it would of course be subrogated to any claim for reimbursement which the insured might have against Edward Sullivan.