COMMONWEALTH vs. JEFFREY ALLEN MELZER.

Suffolk.   May 7, 1982. — July 16, 1982.

Present: GRANT, CUTTER, & BROWN, JJ.

*Duress.   Practice, Criminal,* Instructions to jury.

If there was any error at the trial of a criminal case in the judge's refusal
to instruct the jury that the defense of duress could be based on a threat
of serious bodily injury to another, as well as a threat of injury to the
defendant, the error was harmless in the circumstances, including un-
contradicted testimony that the defendant had failed to take advantage
of an opportunity to escape during the commission of the crime. [182-185]

INDICTMENTS found and returned in the Superior Court
on June 23, 1978.

The cases were tried before *Alberti,* J.

*John F. Palmer (John E. Conwell* with him) for the de-
fendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney, for
the Commonwealth.

CUTTER, J.   Melzer was charged on nine indictments with
offenses alleged to have taken place in Revere on June 15,
1978. He was found guilty on five indictments, viz., three of
armed robbery, one of assault and battery with a handgun,
and one of armed assault in a dwelling with intent to com-
mit a felony.[1]  For the convictions of armed robbery and
armed assault in a dwelling, concurrent sentences of twenty
to thirty years at M.C.I. Walpole were imposed.   For the
conviction of assault and battery with a handgun, he was
given a concurrent sentence of seven to ten years.

Melzer, on his appeal, has argued only one alleged error,
pertaining to a single aspect of the trial judge's charge on the

---

[1] The jury did not reach verdicts on other indictments, as to which mis-
trials were allowed. They were placed on file with Melzer's consent.

subject of duress. He had asked that the judge "instruct
. . . that . . . duress requires a present immediate and im-
pending threat of such a nature as to induce a well-founded
fear of death or serious bodily injury if the criminal act [s of
which Melzer was convicted are] . . . not done; [that Mel-
zer] . . . must have been so positioned as to have no reason-
able chance of escape," and "that the fear of death or serious
bodily injury is to . . . [Melzer himself] *or to another person*
*if the criminal act is not done*" (emphasis in original request).
The trial judge expressly declined to include in his instruc-
tion the emphasized language. See note 4, *infra,* and the
related text. Melzer contends that there was evidence which
required that the refused portion of the instruction be given.
To test this contention, we summarize the principal (but, as
would be expected after a lapse of time, not wholly consis-
tent) evidence adduced at the trial in March, 1981, nearly
three years later.

### Gear's Testimony

Robert Gear testified that in 1978 he lived at 672 Revere
Beach Boulevard, Revere. In February of that year he met
Melzer in Florida, where Melzer helped to maintain Gear's
boat. When Gear returned to Massachusetts, he found that
his Revere house had been damaged by the great 1978 bliz-
zard. Arrangements were made for Melzer (who then "had
just turned eighteen years old") and three others to go for
about a month to Revere to help Gear with repairs. (Melzer
returned to Florida in mid-March, 1978.)

On the morning of June 15, 1978, Gear, with his friend
Robert Tracey, was in an office which he maintained in his
Revere house. A plumber, Dennis Haggett, was working
on the second floor. Melzer and two companions, Dwight
Harrison and Robert Gaita, entered through the front door,
left open for Haggett to use. Melzer asked permission to
show Harrison the work that he had done in the winter.
Melzer and Harrison went upstairs. Upon their return,
Gear and Tracey to move to
the living room and to lie down on the floor. Harrison, who

had a gun, left the living room and returned with Haggett, who also was ordered to lie on the floor. The intruders then took all the cash and valuables of Gear, Tracey, and Haggett (the victims).

Harrison then started screaming at Gear, "Where's the safe?" Gear replied that there was no safe but only "a fireproof vault in the attic" for papers. Gear took Harrison to the attic and pointed out a small unlocked container. Harrison found there only a bag of coins and said that, if they didn't reveal the (non-existent) safe, "he'd blow . . . [their] heads off." Gear, thinking Harrison was going to kill them, offered to take Harrison to his bank in Everett to get some money he had there. After some further search for the safe, the victims were taken to a den or exercise room on the second floor. Harrison then decided to go to Gear's bank with Gear and Gaita, leaving Melzer in charge of Tracey and Haggett. Harrison asked Gear how long that would take and was told that the round trip would require about forty-five minutes. Harrison told Melzer, "If we're not back in forty-five minutes, dust them . . . ."

Harrison, Gear, and Gaita proceeded in Gear's automobile to the bank. Gaita and Gear obtained admission to Gear's safe deposit box, from which (in a small room near the bank vault) Gaita took $6,000 or more in currency and some Series E savings bonds. They then left the bank, rejoined Harrison, and returned to Gear's house.

The intruders were upset because there was not more cash in Gear's safe deposit box. A further search for the safe took place. Gear was moved to the living room and Tracey and Haggett were taken to the attic. Gear was forced to accompany the intruders on their further search for the safe.

Harrison heard a noise in the attic and went to investigate. Gaita had to go to the bathroom and handed his gun to Melzer to control Gear. When Gaita came out of the bathroom, Gaita regained his gun and Melzer ran upstairs to check the increasing noise. The noise distracted Gaita for a moment. Gear ran through the living room and out the back door. He heard shots and saw Melzer outside the house near the front door. Gear ran into the next house and called the police.

### Tracey's Testimony

Tracey described the events of June 15 in generally similar terms and told about being bound with a jump rope. When Harrison, Gear, and Gaita went to the bank, Melzer apparently was armed only with a wooden device, with a chain attached, known as a "Num Chuk." See G. L. c. 269, § 10(*b*), as amended through St. 1975, c. 585, § 1. The period of the trip to the bank to Tracey "seemed like forever."

When Harrison returned from the bank, Tracey's and Haggett's feet were unbound enough so that they could be taken to the attic where they were told to lie on a blanket. Harrison gagged them with paper towels and their feet were tied with what looked like an extension cord.

While Tracey and Haggett were in the attic, they were checked periodically by each of the intruders. On the last occasion, Harrison approached them with a gun, which he either put down or handed to someone else. He pulled out a knife and placed a plastic bag over Tracey's head. A struggle ensued in the course of which Harrison stabbed Tracey in several places, and Haggett and Tracey fell out of the attic to the first floor landing. Thereafter, still tied together, they made their escape through the front door pursued by Melzer, then armed with a pistol. He shot Tracey in the leg.

### Haggett's Testimony

Haggett's testimony in most respects essentially was like that of Tracey. He described Gear's absence for the trip to his bank as "a half-hour or so." In the attic just prior to the escape struggle, he saw Harrison stab Tracey at least twice, but did not see a gun in his hand. He saw Melzer come up the attic stairs with a gun in his hand to assist Harrison. Melzer struck Haggett on the head with the gun, and Haggett saw the gun fall down the attic stairs. Haggett then "dove head first out of the attic" and dragged Tracey with him because they were still bound together at the ankles. When they were outside the house, Haggett was hit in the back by a bullet. He looked toward the front door and saw Melzer there with a gun. Melzer then "trotted up to" Tracey,

who pleaded with Melzer not to shoot, and "very deliberately . . . Melzer . . . pulled the trigger and hit him."

### Melzer's Testimony

Melzer's testimony, referred to by his counsel in his brief, in general outline conceded the occurrence of certain events of June 15, 1978, recounted by Gear. He also gave the following testimony. Melzer returned to Fort Lauderdale from a week or two in Revere in March of 1978. He met Harrison in Daytona Beach in early June, while Melzer was working in a bar. Melzer discussed with Harrison his intention to go to Ohio, and Harrison offered to drive him as far as northern Virginia. They met for the drive north. Harrison was accompanied by Gaita. During the trip Melzer talked about his work in Revere for Gear, whom he described as having a lot of money. Gaita asked him further questions about Gear.

At some stage, Melzer realized that they had passed the point at which he had planned to leave the group to cut off to Ohio, and asked to be allowed to leave them. Gaita refused and suggested that Melzer direct them to Gear's house in Revere. When Melzer objected, Harrison pushed Melzer back into his seat and pointed a pistol at him. Gaita also showed a gun. There was conversation about their need for money "to get out of the country."

Melzer gave unpleasant and sordid testimony about the behavior of Harrison and Gaita during the balance of the trip north and claimed that they compelled him to submit to sodomy, to commit fellatio, and to swallow pills of unknown content. They took his wallet which contained a card giving Gear's Revere address. In Massachusetts, Melzer showed them Gear's house and then the group spent the night in a motel. Melzer claimed to think that he could not escape "without getting shot."

The next morning, according to Melzer's testimony, he was "still . . . foggy" from the effect of a half-pill taken the night before. He then was given by Harrison a small blue or purple pill. They went to Gear's house and were admitted, after Harrison had told Melzer "[j]ust get us in the house

. . . . If you do like I tell you nobody will get hurt and you won't get hurt."

Then occurred events much as described by Gear. At some stage, Harrison sent Melzer to get a bag from their automobile. Before Melzer left to get it, Harrison, somewhat obscurely, reminded Melzer that he had a picture of Melzer's mother and her address and would harm her, the victims, and Melzer himself, if he (Melzer) did not return. Melzer testified that he then had tried to dissuade Harrison from going forward with his robbery project.

Melzer conceded that, when Harrison and Gaita took Gear to the Everett bank, Melzer was left alone with Tracey and Haggett. Melzer claimed not to have made any attempt to escape because "[t]hey told . . . [him] they would kill" him and "Gear, too." He made no attempt to free Tracey and Haggett and never called the police, or went to a neighbor's house. He just sat there. He said he felt sick, had "hot flashes," and was somnolent and lethargic. Melzer purported to be "embarrassed" when confronting Gear at the end of the intrusion.

As to the shooting, Melzer's somewhat confused testimony, was that, when he heard screaming, he "ran upstairs," toward the attic, with a gun which Harrison handed to him. In the attic, he said, he "kicked the knife that was in . . . [Harrison's] hand" but did not remember hitting anybody with the gun in his own hand. Then Harrison "had a gun again" but, after Harrison fired "three or four" shots, the gun fell onto the floor and Melzer picked it up himself and fired the gun "blindly," in order "to make noise," until there were no bullets left in the gun. Outside the house, Melzer heard Tracey say (when he confronted him and Haggett), "No, Jeff, don't," but asserted that he did not fire the gun which he still had in his hand. He testified also that once more Gaita threatened to kill him, and that Harrison and Gaita dragged him into their vehicle.[2] He gave a de-

---

[2] There was testimony from one Trudy Mercer that she was on Revere beach at the time of the shooting and saw two men tied together crossing

tailed account of the intruders' escape from Revere to New York and New Jersey and of his own escape from Harrison and Gaita, who, he said, had continued to abuse him. He himself, after a trip as far as Colorado, was arrested many months later in Florida. He made no effort to surrender himself or to talk to any police.

\*   \*   \*   \*

1. The authorities on duress or coercion have been collected recently by Mr. Justice Kaplan, with characteristic thoroughness, in *Commonwealth* v. *Robinson*, 382 Mass. 189 (1981). In that case, the court (at 206) was "content to assume, without deciding . . . that the burden of disproving duress beyond a reasonable doubt was upon the Commonwealth as a matter of constitutional law." In the present case, the trial judge charged in accordance with this assumption in terms set out in the margin.[3] In the *Robinson*

the road, and also saw three other men with a gun run across the street "extremely fast" and enter a grey parked vehicle. She did not see anyone being pulled or dragged.

[3] The charge stated, "exercise of free will is essential to the commission of a criminal act. Criminality does not attach to an act committed under duress if the defendant had no free will [b]ecause if he had no free will, he could have no criminal intent.

"Evidence has been introduced tending to establish duress which amounts to a contention that there was a present, immediate, and impending threat upon the defendant, of such a nature as to induce a well-founded fear of death or of serious bodily injury if the criminal act is not done. *The defendant must have no reasonable chance of escape.* He must have been put in a condition of mind where neither he nor a person of reasonable firmness and courage could have acted otherwise in the circumstances.

"Duress is not a refuge. If a person places himself recklessly in a situation where the coercion would probably be applied, the effect of duress is to . . . [reduce] a person to a state of involuntariness or automation. To find duress there must be unlawful conduct by another of that degree sufficient to overcome the mind and will of a person of ordinary firmness and courage and actually overcoming the will of the defendant. In determining whether the defendant acted as a person of reasonable firmness and courage, you might consider the effects of involuntary intoxication or of drugs involuntarily ingested.

"Finally, there must be caused a well-founded fear of death or severe bodily harm *with no reasonable opportunity of escape.* A threat of future

case, however, there was no occasion for the court to consider whether duress involved the threat of death or bodily injury only to the person claiming to have acted under duress or whether a serious threat and risk to another person might suffice as duress or coercion.

The Massachusetts authorities on this narrow issue do not seem directly controlling. See *Commonwealth* v. *Barnes*, 369 Mass. 462, 467 (1976); *Commonwealth* v. *Martin*, 369 Mass. 640, 646-647 (1976, where there is discussion of the somewhat analogous situation of the use of force for the protection of another); *Commonwealth* v. *Monico*, 373 Mass. 298, 301-304 (1977); *Commonwealth* v. *Kennedy*, 4 Mass. App. Ct. 772 (1976); *Commonwealth* v. *Averill*, 12 Mass. App. Ct. 260, 262-263 (1981); *Commonwealth* v. *Brugman*, 13 Mass. App. Ct. 373, 376-383 (1982). See also *Commonwealth* v. *Elwell*, 2 Met. 190, 192 (1840); *Commonwealth* v. *Deagle*, 10 Mass. App. Ct. 748, 750-751 (1980). The *Robinson* case, 382 Mass. at 199-200, and the *Kennedy* case, *supra*, cite with approval *R.I. Recreation Center, Inc.* v. *Aetna Cas. & Sur. Co.*, 177 F.2d 603, 605 (1st Cir. 1949). In that case, especially in the separate opinion of Chief Judge Magruder (at 606), there was strong indication that the defense of duress (at least with respect to a crime less than murder) would be "available to an accused when he can

---

harm is not enough. The threat must be imminent *and continue throughout the entire course of criminal conduct.* Duress is not available to any person who voluntarily enters into a criminal enterprise and willfully places himself in a situation in which it was probable that he would be subject to duress. The burden is on the Commonwealth to prove that the defendant voluntarily committed the crimes alleged and to negate duress, all beyond a reasonable doubt" (emphasis supplied).

After a brief bench conference, the judge added that the use of the word "automation" was an error and that he should have said that "the effect of duress is to reduce a person to a state of involuntariness or autonomism." He went on to say, "Autonomism is a word that means acting in a robot-like quality . . . . Autonomism is one who is totally unable to act on his own but acts in a robot-like manner." At the same bench conference, defense counsel recorded his objection to the judge's failure to instruct that "as to duress . . . the fear of death or severe personal injury [may] be to the defendant and to others."

show that he acted under compulsion of a well-grounded apprehension of death or serious bodily injury either to himself or to a near relative if he should refrain from committing the otherwise criminal act." The authorities outside Massachusetts are by no means uniform.[4]

We think that the Massachusetts courts are likely to follow the principles concerning duress (by creating serious risks to persons other than the actor) set out in the Model Penal Code. It would have been appropriate and wise for the trial judge, in this case to have granted the requested instruction.[5] Whether this was error, we need not decide for (as indicated below) this was in any event harmless error.

2. In the *Robinson* case, 382 Mass. at 199, it was said that "'duress' is usually taken to require a present, immediate, and impending threat of such a nature as to induce a well-founded fear of death or of serious bodily injury if the criminal act is not done; *the actor must have been so posi-*

---

[4] See Annots., 40 A.L.R. 2d 908, 917 (1955) and 1 A.L.R. 4th 481, 507-510 (1980). The Model Penal Code §§ 2.09, 3.02, 3.05 (Proposed Official Draft, 1962; Tentative Draft No. 8, 1958, at 5 and 31; Tentative Draft No. 10, 1960, at 2) provides in explicit terms in § 2.09 (at 40 of the 1962 draft) "(1) It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person *or the person of another,* which a person of reasonable firmness in his situation would have been unable to resist" (emphasis supplied). See LaFave & Scott, Criminal Law 374-381 (1972), and Williams, Criminal Law, The General Part, § 246, at 757 (1961), which approve the position of the Model Penal Code. Perkins, Criminal Law 960 (2d ed. 1969) takes a somewhat less explicit position. The code often has been persuasive in recent cases (see e.g., *Commonwealth* v. *Martin,* 369 Mass. at 649-651; *Commonwealth* v. *Monico,* 373 Mass. at 302; *Commonwealth* v. *Matchett,* 386 Mass. 492, 503 n.12, 505 [1982]), especially where Massachusetts decisions do not appear to be controlling.

[5] If he had done so, he probably also should have charged that the jury could take into account the proximity and nature of the relations, if any, between the defendant and any other person subjected to risk of serious harm. See the *R.I. Recreation Center* case, 177 F.2d at 606; Perkins, Criminal Law 960 (1969); and authorities cited in note 4, *supra.* See also *Commonwealth* v. *Monico,* 373 Mass. at 301-302 & n.3. As neither Gear nor either of the other victims were relatives of Melzer, the absence of such an instruction here is of no importance.

*tioned as to have had no reasonable chance of escape"* (emphasis supplied), citing the *R.I. Recreation Center* case, 177 F.2d at 605, where it was pointed out that (to provide a defendant with an excuse by reason of coercion) "there must be no reasonable opportunity to escape the compulsion without committing the crime." The language just quoted from the *Robinson* case obviously was one basis for the trial judge's instruction. See note 3, *supra.* See also *Commonwealth* v. *Atkins*, 386 Mass. 593, 603-604 & n.12 (1982). We are of opinion that, in the circumstances of this case, the trial judge was entitled to place reliance on the undisputed evidence that, for a half-hour or forty-five minute period, Melzer was left in charge of Tracey and Haggett while Harrison and Gaita took Gear from Revere Beach to the Everett bank. Harrison and Gaita, claimed by Melzer to have been coercing him, were no longer present to continue their pressure. It was, even on Melzer's own testimony, then open to him to release Tracey and Haggett, to alert the police, and to arrange for police interception of Gear's captors at the bank. Indeed, under some Federal cases, it was far from clear that there existed in the aggregate an absence of opportunity to escape adequate to entitle Melzer to any instructions at all on duress. See *Shannon* v. *United States*, 76 F.2d 490, 493 (10th Cir. 1935); *United States* v. *Saettele*, 585 F.2d 307, 309-310 (8th Cir. 1978), cert. denied, 440 U.S. 910 (1979); *United States* v. *Campbell*, 609 F.2d 922, 924-925 (8th Cir. 1979), cert. denied, 445 U.S. 918 (1980). See also *United States* v. *Bailey*, 444 U.S. 394, 409-415 (1980); *United States* v. *Gordon*, 526 F.2d 406, 407-408 (9th Cir. 1975); *United States* v. *Patrick*, 542 F.2d 381, 386-388 (7th Cir. 1976), cert. denied, 430 U.S. 931 (1977).[6] The judge, however, did give instructions, and we consider

---

[6] In the *Campbell* case, 609 F.2d at 924, it was said (citations omitted), "Basically a defense of duress . . . requires that there be an immediate threat of death or serious bodily harm which requires the defendant to commit the criminal act, and it must be in a situation in which there was no opportunity to avoid the danger . . . . Additionally, most courts require the offender to surrender when the threat abates, this factor usually

the evidence together with and in the light of those instructions.

We have in mind the principle that, even if a criminal defendant gives incredible testimony, he is entitled to any instruction required upon the hypothesis that the testimony is true. See, e.g., *Commonwealth* v. *Martin*, 369 Mass. at 644. In the present case, the evidence most favorable to Melzer's claim that he acted under duress reveals at least a half an hour in the middle of a continuing criminal episode in which his alleged coercers were absent, during which he remained inert, not even exerting himself to make sure that they had departed. He simply did nothing but sit. To justify any charge on duress, we think that the evidence, viewed most favorably to Melzer, must establish that he had no reasonable opportunity to escape. Even the uncontested facts of this case do not amount to such a showing.

Melzer suggests that he feared for the safety of his mother. No evidence indicated that she was closer to Revere than Ohio. She was plainly subject to no *immediate* risk. He claimed to be still under the influence of drugs, but the trial judge had told the jury in his charge that they could consider "the effects . . . [upon Melzer] of drugs involuntarily ingested." Despite that instruction, the jury had convicted Melzer. The testimony, concerning any fear of danger to Gear, if Melzer should have released his captives (Tracey and Haggett) during Harrison's absence also was meager[7] if

arising in escape cases . . . . [Compare *Commonwealth* v. *Thurber*, 383 Mass. 328, 330-331 (1981).] The defendants are required to introduce facts sufficient to trigger consideration of the coercion defense by way of an instruction. They must introduce evidence on *all elements* of the defense . . . . If evidence is introduced, but it is apparent that all of the requirements of the coercion defense are not addressed, the trial court is not obligated to allow the evidence to remain for consideration by the jury" (emphasis supplied).

[7] On cross-examination, Melzer was asked what he would have done if Tracey or Haggett had attempted to leave while Harrison and Gaita were with Gear at the Everett bank. He replied, "I don't know what I would have done. They told me they would kill . . . Gear." When asked why (in the face of Harrison's and Gaita's alleged sexual abuse of him) he did

not trivial. There was little or no likelihood that for Melzer to continue as a participant in the criminal enterprise, rather than to take his opportunity to escape, would have had any effect on whether harm to Gear would ensue when the trip to the bank ended.

In any event, if Melzer's somewhat unusual story was to be believed at all, he himself and Gear were about equally threatened. In accordance with that story, any risk of death or serious injury to Gear also applied to Melzer, and nothing suggested that Gear's risks would be lessened if Melzer failed to take the opportunity to escape. The jury had rejected the defense of duress as applied to Melzer himself. This rejection strongly indicates that the result would have been the same if the risk to Gear had been mentioned. We perceive no respect in which adding the words "or to another person" to the judge's charge would have altered significantly the issue for the jury or would have been of benefit to Melzer. On this account, if the omission of the requested addition must be held to have been error, we think it was harmless error. Compare *Commonwealth* v. *Monico*, 373 Mass. at 303-304, where the court held, in somewhat analogous circumstances, that the defendant had not met "the burden of producing sufficient evidence to raise the issue" (there of threat of serious harm from unlawful actions of others justifying resort to force) so that any error in the instructions was harmless beyond a reasonable doubt.

3. We address three further questions briefly.

(a) The judge (see note 3, *supra*) charged that the Commonwealth must "negate duress . . . beyond a reasonable doubt." No problem thus arises such as that which caused reversal in *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 690-692 (1976). Compare, however, *Commonwealth* v. *Robinson*, 382 Mass. at 207-209.

(b) Melzer's opportunity to escape occurred a few hours after the intruders originally entered Gear's house. The

---

not "take off when . . . [he] had . . . [a] chance," he replied, "Because they told me they were going to kill . . . Gear."

occupation of Gear's house must be viewed as unlawful from the beginning after Gaita announced that this was a robbery. Melzer's failure to abandon the enterprise, when he had the chance to do so, we think, prevented him from later asserting a defense of coercion even as to events which had already happened.

(c) Melzer's conduct after Gear and his captors returned from the bank, even on Melzer's own testimony, showed willing and affirmative participation in the robbery venture. His failure to report the facts to appropriate public authorities after his ultimate "escape" from Harrison and Gaita also gave color to his failure to escape during Gear's trip to the bank.

*Judgments affirmed.*