## Commonwealth vs. Alan Perl.

No. 99-P-112.

Plymouth. March 9, 2000. - November 7, 2000.

Present: Kass, Gillerman, & Jacobs, JJ.

*Practice, Criminal,* Instructions to jury. *Duress. Evidence,* Conversation between husband and wife. *Words,* "Imminent harm," "Marital disqualification."

At a criminal trial in which the defendant made a claim of duress, the judge's instructions to the jury, defining duress as a fear of "imminent" bodily injury, were proper and consistent with the definition of duress set forth in *Commonwealth* v. *Robinson,* 382 Mass. 189, 199-200 (1981) [447-451]; further, the judge did not err in declining to instruct that duress could be established by proof of a threat of harm to a member of the defendant's family, where there was insufficient evidence to establish such a threat of imminent harm [451-452].

At a criminal trial, the judge did not err in prohibiting, based on the marital disqualification statute, G. L. c. 233, § 20, the defendant from testifying to the content of a private conversation with his wife, where the testimony would have been cumulative of other properly admitted evidence and would not have contributed materially to the defendant's case. [453-454]

Indictments found and returned in the Superior Court Department on November 1, 1994, and December 12, 1994, respectively.

The cases were tried before *Judith Fabricant,* J.

*Steven R. Schuh* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

Jacobs, J. The defendant, a physician, was convicted by a Superior Court jury of multiple counts of unlawful distribution of a class B substance.[1] On appeal, he claims that the judge

---

[1] The convictions were based on three indictments containing three counts of unlawful distribution of oxycodone and two counts of unlawful distribution of oxycodone in a school zone. There was evidence that Percocet is the brand

committed reversible error by instructing the jury that the duress defense requires that the threatened harm be "imminent," and by refusing to permit him and his wife to testify concerning their private conversations. We affirm.

*Background.* The Commonwealth presented evidence that the defendant unlawfully sold Percocet pills from his office in Brockton to an undercover State trooper on October 18, 1994, October 20, 1994, and November 10, 1994. The trooper had been introduced to the defendant by a former patient, Dennis LaCorte, who identified the trooper as his sister-in-law. LaCorte was present at the first sale; the trooper was alone with the defendant during the other sales.

The defendant testified in pertinent part as follows: In August, 1993, LaCorte, a patient, described himself as a longtime criminal and threatened to "hurt" the defendant and his family if he did not supply LaCorte with prescriptions for pills. At that time, LaCorte also threatened that a friend of his would "take care" of the defendant and his family if he "snitched." In December, 1993, LaCorte directed the defendant to supply him with pills rather than prescriptions. When the defendant refused, LaCorte said, "I know where your daughter lives. I know where she goes to school. I know how she gets there." LaCorte then placed his hands on his own throat and gestured, and then waved a gun in front of the defendant's nose. The defendant's daughter was then fifteen years old. In January, 1994, a friend of LaCorte told the defendant, "You better do as [LaCorte] says if you know what's good for you." In March, 1994, LaCorte, without invitation, appeared at the defendant's home in Warwick, Rhode Island, said only, "Hi, Doc. Nice house you have here," and departed. On another occasion, LaCorte pointed out a large dog in his car and said to the defendant, "Doc, you don't know what this dog can do to a child." In July, 1994, LaCorte told the defendant that if he did not supply him with pills, "I will see your daughter." The defendant's daughter moved to California in August, 1994. The defendant unlawfully supplied LaCorte with prescriptions and pills throughout the period from August, 1993, until October 18, 1994, the day when LaCorte introduced the undercover trooper to the defendant.

*Duress instruction.* The judge instructed the jury as follows:

name for oxycodone. The defendant was sentenced to serve one year in the Plymouth house of correction to be followed by a two-year from and after house of correction sentence. He was also sentenced to a probationary term.

"To have duress, three things must be present. First, the defendant must have received a present and immediate threat which caused him to have a well-founded fear of imminent death or serious bodily injury if he did not do the criminal act. That must be imminent and must be present throughout the commission of the crime. Second, the defendant must have had no reasonable opportunity to escape. And third, the defendant, or any other person of reasonable firmness, must have had no other choice and been unable to do otherwise in the circumstances."[2]

Relying on the definition of duress in *Commonwealth* v. *Robinson*, 382 Mass. 189 (1981), the defendant argues that there is no "imminence" requirement under our law. In *Robinson*, the court stated as follows:

"[I]n respect to serious crimes . . . 'duress' is usually taken to require a present, immediate, and impending threat of such a nature as to induce a well-founded fear of death or of serious bodily injury if the criminal act is not done; the actor must have been so positioned as to have had no reasonable chance of escape. He must have been put in a condition of mind where neither he nor a person of reasonable firmness could have acted otherwise in the circumstances." (Citation omitted.)

*Id.* at 199-200. This definition has been recognized in recent decisions. See, e.g., *Commonwealth* v. *Allen*, 430 Mass. 252, 255-256 (1999); *Commonwealth* v. *Egardo*, 42 Mass. App. Ct. 41, 44 n.2, *S.C.*, 426 Mass. 48 (1997).[3]

The defendant asserts that the judge erred by limiting the

---

[2]This instruction is a virtually verbatim excerpt from the Model Jury Instructions for Use in the District Court § 6.02 (1997). The only difference between the judge's instruction and the model instruction occurs in the second sentence of the explication of the first prong. The model instruction states as follows: "The threat must be imminent and must be present throughout the commission of the crime." The judge substituted the word "That" for the words "The threat."

[3]Prior to the decision in *Commonwealth* v. *Robinson, supra,* this court in *Commonwealth* v. *Kennedy,* 4 Mass. App. Ct. 772, 772 (1976), rejected a defense of "compulsion," defining that term with a quotation from *Rhode Island Recreation Center* v. *Aetna Cas. & Sur. Co.,* 177 F.2d 603, 605 (1st Cir. 1949), an opinion also cited in *Robinson, supra* at 199-200. We required in *Kennedy, supra,* that a compulsion be "present, immediate and impending, and of such a nature as to induce a well founded fear of death or at least seri-

jury's evaluation of his duress defense to a "fear of *imminent* death or serious bodily injury" (emphasis supplied) rather than using the instruction requested by him, which in pertinent part tracked the *Robinson* definition. He argues that the imminence requirement in that instruction and in the following sentence are contrary to "the state of the law in Massachusetts" and to "the purpose behind the defense of duress."

While there is considerable support among commentators[4] and in the Model Penal Code[5] for defining duress without reference to temporal limits, *Commonwealth* v. *Robinson*, 382 Mass. at 199, and the decisions accepting its definition, have unmistakenly included a proximity element by requiring "a present, immediate, and impending threat." It is significant that the instruction requested by the defendant included this phrase and that he did not object at trial, or in argument to us, to the judge's reference to a "present and immediate threat." Because the words or gestures constituting a "threat"[6] can be communicated only in the present, we conclude, as matter of logic, that the words "present, immediate, and impending" must be viewed as referring to the threatened harm. This is especially so with "impending," a word which, by definition,[7] looks to the future and has little adjectival force when combined with a word connoting an

ous bodily injury . . . [and from which there was] no reasonable opportunity to escape . . . without committing the crime."

[4] See, e.g., 2 Robinson, Criminal Law Defenses § 177(e)(2) (1984) ("while proximity may be an important evidentiary factor in determining whether the defendant is actually coerced . . . , the adoption of an arbitrary temporal limit beyond which duress will never be recognized is to invite punishment of blameless victims of coercion"); Newman & Weitzer, Duress, Free Will and the Criminal Law, 30 S. Cal. L. Rev. 313, 334 (1957) ("The standard requiring that the danger threatened be present, imminent, and impending . . . should be disregarded"); Perkins, Impelled Perpetration Restated, 33 Hastings L.J. 403, 414-415 (1981).

[5] Section 2.09 of the Model Penal Code (1980) provides in pertinent part, "It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, that a person of reasonable firmness in his situation would have been unable to resist."

[6] "Threat" is commonly defined as "an expression of an intention to inflict evil, injury, or damage." Webster's Third New International Dictionary 2382 (1993).

[7] "[T]hat is about to occur." Webster's Third New International Dictionary 1132 (1993). "To be about to take place." The American Heritage Dictionary 905 (3d ed. 1996).

existing communication. We conclude that the judge's use of "imminent" to modify the feared harm ("death or serious bodily injury") is consistent with the tone and general meaning of "present, immediate, and impending" as used in the *Robinson* definition. Defined as "near at hand," or "menacingly near," Webster's Third New International Dictionary 1130 (1993), "imminent" also succinctly conflates the meaning of "present, immediate, and impending," and, as used by the judge, permits jurors to apply it in the context of the totality of the evidence credited by them and without absolute time limits. The instruction at issue also is consistent with *Commonwealth* v. *Melzer*, 14 Mass. App. Ct. 174 (1982). There, the defendant claimed he suffered duress due, in part, to threats to harm his mother, who lived out of State. We noted that "[s]he was plainly subject to no *immediate* risk" (emphasis original). *Id.* at 184.[8] It is significant that Justice Kaplan followed his definition of duress in *Commonwealth* v. *Robinson, supra,* with a citation to *Rhode Island Recreation Center, Inc.* v. *Aetna Cas. & Sur. Co.,* 177 F.2d 603, 605 (1st Cir. 1949), in which the court stated that "a veiled threat of future unspecified harm, as the threat 'to take care of', and 'not to forget' is not the equivalent of an immediate threat of death or severe bodily injury." *Ibid.*

Further support for an imminency requirement derives from that aspect of the *Robinson* definition stating the defendant "must have been so positioned as to have had no reasonable chance of escape." 382 Mass. at 199. It may be inferred from this requirement that if the Commonwealth proves that the threatened harm is not so menacingly near as to render unreasonable any escape or avoidance, duress is not established.[9] The Model Penal Code definition of duress, see note 5, *supra,*

[8]One commentator, in analyzing a similar cluster of adjectives ("present, imminent and impending"), indicated that a threat must be "present" in the sense that it influences the mind of a defendant not only when it is made but also at the time of the criminal act. Dressler, Exegesis of the Law of Duress: Justifying the Excuse and Searching for its Proper Limits, 62 S. Cal. L. Rev. 1331, 1339 (1989).

[9]The linkage between an imminency requirement and the chance of escape standard is evident in *United States* v. *Moreno*, 102 F.3d 994 (9th Cir. 1996), cert. denied, 522 U.S. 826 (1997), a case with many parallels to this case. There, in a jurisdiction requiring "an immediate threat," and a "lack of a reasonable opportunity to escape," *id.* at 997, the court held that the defense was not available to a defendant who claimed that he was coerced into transporting cocaine from California to Hawaii by a violent gang member who on two separate occasions threatened to kill the defendant and his family,

does not include an imminency requirement and also does not expressly require a defendant to avail himself of a reasonable opportunity to escape. By linking the imminency of harm and the possibility of escape, we advance, as matter of policy, the proposition that a threatened person, given the opportunity, must utilize available law enforcement resources to avoid committing a serious crime, provided those resources reasonably may be relied upon in the circumstances to protect him and any other threatened person. See *United States* v. *Mareno*, 102 F.3d 994, 997 (9th Cir. 1996), cert. denied, 522 U.S. 826 (1997). Compare *Commonwealth* v. *Brugmann*, 13 Mass. App. Ct. 373, 379-380 (1982) (in discussing the defense of "necessity," we stated, "Where there is an effective alternative available which does not involve a violation of the law, the defendant will not be justified in committing a crime. The defendant must make himself aware of existing alternatives and pursue those which are lawful, or show them to be futile in the circumstances").

Arguing that "[t]he issue is whether the threat deprived [him] of his free will," the defendant essentially claims that an imminency requirement ignores the reality that one's will may be overborne by a threat to do harm in the indefinite future. While the duress defense theoretically may be premised on relieving a person from criminal responsibility if he acts under compulsion rather than free will, the doctrine as generally defined by statute and case law has developed standards which are not limited to the subjective state of mind of the defendant. In *Robinson*, the court noted that "[a] definition of duress in terms of a person of 'reasonable firmness' moves the concept away from a pure inquiry into voluntariness." *Commonwealth* v. *Robinson*, 382 Mass. at 204 n.18. The same may be said of the requirement of "a well-founded fear of death or of serious bodily injury." *Id.* at 199. See Newman & Weitzer, Duress, Free Will and the Criminal Law, 30 S. Cal. L. Rev. 313, 315 (1957). Given the acceptance of the *Robinson* definition, any movement toward an absolute free will requirement properly awaits legislative action. Compare *Commonwealth* v. *Allen*, 430 Mass. at 256 n.2. In

---

revealed a gun, and stated that he knew where the defendant's daughters lived. *Id.* at 995-996. The court reasoned that the defendant had a reasonable opportunity to escape the threatened harm "at any time" between his initial encounter with the gang member and arrival at the airport in Hawaii. *Id.* at 997. The court also noted that the defendant had a clear opportunity to save himself and "alert authorities about the threat to his family." *Id.* at 997-998.

sum, we conclude the judge did not err by including an imminency requirement in her instructions on duress.[10,11]

The defendant also argues that the judge erred by not giving his requested instruction that duress could be established by proof of a threat of harm to a member of the defendant's family. Although the "threat to another person" formulation arguably places considerable strain on the *Robinson* definition of duress,[12] the combination of free will analysis, the great weight of author-

---

[10]There is no merit to the defendant's contention that the imminency requirement is contrary to our decision in *Commonwealth* v. *Egardo*, 42 Mass. App. Ct. 41, 44-45, *S.C.*, 426 Mass. 48 (1997). In addressing an issue we did not otherwise "consider," we stated that at any retrial defense counsel would be "well-advised not to request a duress instruction which includes the language that 'a threat of future harm is not enough' as this formulation has been the subject of criticism." With the benefit of the record in that case, we know that this court was alluding to an instruction requested in the underlying trial that in pertinent part tracked the 1988 edition of the Model Jury Instructions for Use in the District Court. There, the sentence, "[a] threat of future harm is not enough," was followed by "the threat must be imminent and must be present throughout the commission of the crime." It is significant that our court in *Commonwealth* v. *Egardo*, *supra*, did not caution against the use of the imminency language in the latter sentence. Accordingly, the inclusion of an imminency requirement in the duress instruction in the 1997 edition of the Model Instructions, see note 2, *supra*, was not in derogation of our advice. Rather, the relevant change and comments in the 1997 Model Instructions merely reflected an acknowledgment of the following criticism contained in a commentary cited by us in *Commonwealth* v. *Egardo*, *supra* at 45: "Since threats are promises of future harm and such harms, if occurring at the time of the act which is being forced, would be an impossibility having no meaning in terms of the 'duressed's' choice, such distinctions also lack meaning." Newman & Weitzer, Duress, Free Will and the Criminal Law, 30 S. Cal. L. Rev. 313, 328 (1957).

[11]We intimate no opinion as to the appropriate definition of duress in the context of a defense to a crime raised by a battered offender. See *Commonwealth* v. *Pike*, 431 Mass. 212, 222-223 (2000). See also Dore, Downward Adjustment and the Slippery Slope: The Use of Duress in Defense of Battered Offenders, 56 Ohio St. L.J. 665 (1995).

[12]See Newman & Weitzer, Duress, Free Will and the Criminal Law, 30 S. Cal. L. Rev. 313, 323 (1957) ("[i]f the threats required for a showing of duress must be of serious bodily harm or death, then it would seem that they must be directed towards the person being coerced"). Also, the "no reasonable chance of escape" requirement generally would appear to limit the duress defense to the defendant. See *Spears* v. *State*, 727 P.2d 96, 98 (Okla. Crim. App. 1986) (where duress statute did not state against whom the threat of harm exists, court determined that the common law rule is that the threat of harm must be against the defendant).

ity,[13] and Justice Cutter's cautious prediction in *Commonwealth* v. *Melzer*, 14 Mass. App. Ct. at 182,[14] lead us to conclude that such language should be included in the definition of duress. It was not error, however, for the judge not to do so here because there was not sufficient evidence to establish an imminent or impending threat to the defendant's daughter or any other member of his family. According to the defendant's testimony, the last threat made to him was in July, 1994. Although the defendant testified to last seeing LaCorte on October 18, 1994, and speaking to him by telephone in the early part of November, 1994, no evidence indicated that any threats were communicated to him at or near the times of the illegal sales of October 18, October 20, and November 10, 1994. No reasonable juror could have concluded that the defendant's daughter, who was then in California, or any member of his family, was in danger of imminent harm at the time the charged crimes were committed. "A judge need not charge on an hypothesis not supported by evidence." *Commonwealth* v. *O'Dell*, 15 Mass. App. Ct. 257, 261 (1983), and cases cited.

Even if we assume the judge erred by not including a "threatened harm to another person" in the duress instruction, the error was not preserved for appeal.[15] We, therefore, apply a substantial risk of a miscarriage of justice standard. *Com-*

---

[13]See 1 LaFave & Scott, Substantive Criminal Law § 5.3, at 621 (1986) ("[t]he overwhelming majority of [duress] provisions extend to threats of harm to third parties").

[14]Justice Cutter stated, "We think that the Massachusetts courts are likely to follow the principles concerning duress (by creating serious risks to persons other than the actor) set out in the Model Penal Code." *Commonwealth* v. *Melzer, supra* at 182.

[15]Although the defendant incorporated harm to an actor's "family" in his requested instruction, his only objection at the charge conference to the judge's indication that she was going to charge "virtually word for word" from the 1997 Model Jury Instructions for Use in the District Court was to her proposed use of the word "imminent." Similarly, the only relevant objection lodged by the defendant after the judge completed her charge was "to instructing on imminent death or serious bodily injury." The charge essentially was not inconsistent with the defendant's request and, in any event, it hardly can be said that "the point [relating to threatened harm to another person] was brought to the judge's attention." *Commonwealth* v. *Biancardi*, 421 Mass. 251, 254 (1995). See *Commonwealth* v. *Morgan*, 422 Mass. 373, 376-377 (1996). Compare *Commonwealth* v. *James*, 424 Mass. 770, 786 n.25 (1997). Mere incorporation of a specific instruction in a set of requested instructions filed with the court, unaccompanied by any attempt at a charge conference to bring the specific request to the judge's attention or to object, then or after

*monwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). Given the focus of the trial, and arguments of counsel, on the credibility of the defendant and his witnesses and whether the defendant availed himself of the opportunity to obtain help, we are not persuaded that the result of the trial might have been different if the instruction in question had been given to the jury. Accordingly, we conclude there is no substantial risk of a miscarriage of justice. *Commonwealth* v. *Alphas*, 430 Mass. 8, 13, 23 (1999).

*Marital disqualification.* The defendant claims the judge erred in prohibiting him from testifying, during his direct examination, to the content of a private conversation with his wife concerning the LaCorte threats and in not allowing his wife to testify "about statements [the defendant] made to her." In both instances, the judge based her ruling on the marital disqualification statute. See G. L. c. 233, § 20 ("neither husband nor wife shall testify as to private conversations with the other").

The defendant argues that the judge's rulings violated his right, under the Sixth Amendment to the United States Constitution, to present witnesses and his right to a fair trial under that Constitution and art. 12 of the Massachusetts Declaration of Rights. It is recognized that such rights, while not absolute, *Commonwealth* v. *Blaikie*, 375 Mass. 601, 608 (1978), may override State-created evidentiary rules. *Washington* v. *Texas*, 388 U.S. 14, 19 (1967). *Commonwealth* v. *Maillet*, 400 Mass. 572, 578 n.8 (1987). *Commonwealth* v. *Sugrue*, 34 Mass. App. Ct. 172, 177 (1993).

To determine whether the disqualification should yield to the invoked constitutional rights we look to whether the evidence at issue "if admitted might have had a significant impact on the result of the trial." *Commonwealth* v. *McCreary*, 12 Mass. App. Ct. 690, 697 (1981). Stated otherwise, we look to whether the excluded evidence was sufficiently "relevant, material, and not cumulative," *Commonwealth* v. *Degrenier*, 40 Mass. App. Ct. 212, 215 (1996), to outweigh the policies behind the evidentiary bar. *Commonwealth* v. *Sugrue, supra* at 176-177.

---

delivery to the jury, to its not being included in the judge's instructions, does not satisfy the requirements of Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979). That is especially true in the circumstance where, as here, the judge does not expressly reject the specific requested instruction but only indicates that she will give a certain model instruction which is not facially inconsistent with the specific requested instruction.

The defendant's apparent purpose[16] in attempting to introduce conversations between him and his wife was to rebut the suggestion of recent fabrication — when arrested, he had not indicated he acted under duress — by demonstrating that he had discussed LaCorte's coercive behavior before committing the crimes. In the course of the trial, three witnesses, the defendant's daughter, his brother, and a patient, had testified that the defendant had told them of the threats before he was arrested. Consequently, the spousal conversations in issue would have been cumulative and would not have contributed materially to the defendant's case, especially because "such evidence is likely to be unreliable or untrustworthy." *Commonwealth* v. *Sugrue, supra* at 177. There was no error.[17]

*Judgments affirmed.*

---

[16]Although the defendant made no offer of proof, we assume the conversations were offered "only to rebut the claim of recent fabrication," because their hearsay aspect generally prevented their use as substantive evidence of duress. *Commonwealth* v. *Martinez,* 425 Mass. 382, 396 (1997).

[17]We reject the claim that the prosecution "opened the door" for the introduction of the spousal conversations by having the defendant confirm, on cross-examination, that his wife was one of the "only people in the world" he spoke to concerning LaCorte. That inquiry followed questioning directed at why the defendant had not contacted the police. In any event, the defendant, during direct examination, had testified that he had a conversation "about these events" with his wife and that she had overheard his "talking to [himself] about Mr. LaCorte and the pills."